**In re LA SHERENE, INC. d/b/a The Sunrise Corporation, Debtor.**

**Michael DARDARIAN, Plaintiff,**

**v.**

**LA SHERENE, INC. d/b/a The Sunrise Corporation, Defendant.**

**Bankruptcy No. 80–0003A.**

United States Bankruptcy Court, N. D. Georgia, Atlanta Division.

March 4, 1980.

C. Edward Dobbs, Kutak Rock & Huie, Atlanta, Ga., for plaintiff.

Stacey W. Cotton, Cotton, Katz, White & Palmer, Atlanta, Ga., Frank Carmines, trustee, Roswell, Ga., for defendant.

John C. Pennington, Atlanta, Ga., for Frank Carmines, trustee.

## MEMORANDUM

WILLIAM L. NORTON, Jr., Bankruptcy Judge.

This matter came on for hearing on January 3, 9, 16 and 17, 1980 upon the complaint filed herein on January 2, 1980 by Plaintiff Michael Dardarian which prayed, among other things, for the appointment of a trustee pursuant to Section 1104 of the Bankruptcy Code. After considering all evidence brought before it and argument of counsel, the Court has this day entered an order granting Plaintiff's request for the appointment of a trustee for the reasons hereinafter set forth. In support of its order, the court hereby submits the following findings of fact and conclusions of law. To the extent that any such findings shall constitute conclusions of law, they are hereby adopted as such, and to the extent that any such conclusions shall constitute findings of fact, they too are so adopted.

*Findings of Fact*

1. The Debtor herein, La Sherene, Inc., commenced the instant voluntary Chapter 11 case on December 27, 1979. On the same date that this case was commenced, a Chapter 11 case was also filed by Impulse Distributors, Inc. ("Impulse"), a company which is integrally related to the Debtor as will be discussed below.

2. The Debtor has as its principal place of business 4450 Commerce Circle, S. W., Atlanta, Georgia, which is the same place of business as Impulse. The Debtor's President is Armand Kay and its Vice-President and Secretary is Thomas E. McCauley, both of whom sit on its board of directors and are stockholders. Messrs. Kay and McCauley are also officers, directors and shareholders of Impulse. Both the Debtor and Impulse are using the same attorneys in these proceedings and use the same employees.

3. The Debtor is in the business of manufacturing and selling plastic greeting cards, which it distributes on a nationwide basis through various distributors and convenience stores. Most of these greeting cards are about the size, shape and texture of a normal credit card and generally have artwork on one side and printed matter on the reverse side. Most of the cards retail for approximately $1.00 a piece. The Debtor commenced business in January of 1979 and does business under the trade name "The Sunrise Corporation."

4. Although established as a separate corporation from the Debtor, Impulse operates essentially as the sales arm of the Debtor. The Debtor purchases all raw materials and inventory while Impulse solicits business. When an order is made, Impulse "purchases" the necessary inventory from the Debtor, then delivers the goods to the customer, and assigns the invoice to a Chicago-based company known as Dimmett & Owens Financial, Inc., which factors the accounts receivable. The money advanced by Dimmett & Owens is wire transferred to a bank account in the name of Impulse. Impulse never actually pays the Debtor for the inventory but all of the bills of the Debtor, including wages and commissions, are paid out of the account carried in Impulse's name. The Debtor is one of the largest creditors of Impulse.

5. Prior to organizing the business of the Debtor and Impulse, the Debtor's President and 51% stockholder, Mr. Armand Kay, was associated with several other companies. A company known as the Wishing Well, which operated out of Detroit, Michigan, was owned and managed by Kay, but suffered business reverses and ceased business, leaving some of its creditors unpaid. A second company known as Kaymac Distribution Systems, Inc., was owned and managed by Kay, and in August of 1972 was adjudicated a bankrupt upon an involuntary petition. That company had total claims by creditors against it in an amount exceeding $526,000. After the Kaymac bankruptcy, Mr. Kay organized in 1972 a third company known as Sunrise Sales Corporation, which transacted business as The Sunrise Corporation ("Sunrise") in Ferndale, Michigan. Subsequently, Sunrise moved its operations to Atlanta where it had the same office and warehouse facilities now occupied by the Debtor. Sunrise was engaged in the same business as the Debtor. Mr. Kay was its president and Thomas E. McCauley its Secretary Treasurer. Sunrise factored its sales of greeting cards through Dimmett & Owens as did the Debtor later on.

6. Sunrise became indebted to Sherene Kay, Inc., a company owned by Louise Kramedjian, who is Mr. Kay's mother. To secure the indebtedness, Sunrise pledged all of its assets to Sherene Kay, Inc. On or about January 9, 1979, Sunrise apparently was in default in its debt to Sherene Kay, Inc. The debt then totalled approximately $69,800. Sunrise consented to an order in the State Court of Fulton County for a writ of possession with respect to the collateral in favor of Sherene Kay and also consented to a judgment in the full amount of the debt. On January 12, 1979, Sherene Kay, Inc. held a public sale of the collateral and at the sale purchased the collateral for the amount of the debt. On March 13, 1979,

Sunrise filed a bankruptcy petition in this court, along with schedules showing total debts of $805,663.32 and no assets in consequence of the foreclosure. Sherene Kay, Inc., which had purchased the assets of Sunrise, then changed its name to La Sherene, Inc., and under the management of Mr. Kay, resumed the same business as Sunrise, at the same place of business as Sunrise, with the assets (but not the liabilities) of Sunrise, and trading under the name of Sunrise with the same customers that were customers of Sunrise. Mrs. Kramedjian ultimately transferred 51% of her stock in the company to her son, Mr. Kay.

7. Because the Debtor was engaged in the same business as Sunrise, it was forced to do business with some of the same trade creditors as Sunrise in order to purchase needed goods and services. Many of these essential suppliers refused to do business with the Debtor on a credit basis unless the Debtor agreed to pay an additional 10% of the amount of the normal payment terms on each invoice.

8. The Debtor was undercapitalized from its inception. In March of 1979, the Debtor needed money but was unable to obtain credit from institutional sources. The Debtor approached Plaintiff for a loan. Plaintiff was then and is now a resident of Detroit, Michigan. He works for a mortgage company as a salesman. Prior to his current employment, he was a nightclub singer. Plaintiff has never earned in excess of $30,000 a year. However, prior to being first approached by the Debtor, Plaintiff had inherited some $40,000 from the estate of his parents and had this money on hand. Plaintiff agreed to advance the Debtor the sum of $50,000 on March 9, 1979, with such advance evidenced by the Debtor's note for $100,000 and secured by a security interest in all of the Debtor's personal property. The transaction was consummated by the Debtor's pre-bankruptcy attorney preparing and sending the loan documents through the mails to Plaintiff and Plaintiff's signing and returning the documents to Debtor's counsel for proper recordation. At no time was Plaintiff represented by his own counsel in connection with any advance made by

him to the Debtor and Plaintiff at all times relied upon the Debtor's counsel to prepare and record the necessary documentation. Among the items of property listed in the security agreement as collateral for Plaintiff's loan were nine motor vehicles, few if any of which the Debtor ever owned. Plaintiff's security interest was never perfected with respect to any of these motor vehicles, although Plaintiff was informed that the Debtor would insure that proper perfection on all collateral was accomplished. Prior to making the loan, Plaintiff did not receive any written financial statement on the Debtor. Indeed, the Debtor had not by then completed operations for one quarter.

9. On August 9, 1979, the Debtor again approached Plaintiff for additional funds. He was told that the Debtor seriously needed additional money and that his initial advance of $50,000 would be in jeopardy if he did not advance an additional $50,000. Just five days earlier, however, Mr. Kay had directed one of the Debtor's officers to apply to Cobb Bank & Trust for a loan for some $20,000 for a boat for the company. The boat was to be used for "entertainment" by the company. The bank refused to make the loan. Mr. Kay testified that he was not at this time fully aware of the company's serious financial circumstances. Plaintiff at first refused to make the loan unless he was given stock in the Debtor, but ultimately the Debtor relented and advanced an additional $50,000 in return for which he received the Debtor's note for $100,000. In order to be able to make this advance to the Debtor, Plaintiff took out a second mortgage on his house for $75,000 and Mr. Kay knew this. Subsequent advances were requested by the Debtor and made by Plaintiff in September ($25,000), October ($20,000, $4,500 and $6,700) and December ($25,000). The total sum of money actually advanced by Plaintiff to the Debtor was approximately $181,200, but the total indebtedness created by virtue of the face amount of the two notes was approximately $281,200. Plaintiff received payments from the Debtor against the total

indebtedness of an amount exceeding $100,-000.

10. In October or November of 1979, Mr. Kay informed Plaintiff that the Debtor would no longer continue to pay Plaintiff's debt. However, Mr. Kay and Mr. McCauley, along with another officer of the Debtor named Gene Adkins, agreed that Plaintiff should be given stock in the company in appreciation for his advances to the company. Although all of the stock was then owned of record by Mr. Kay's mother, it was contemplated that she would transfer the stock to her son and the other officers and that Plaintiff would receive a percentage of this issued and outstanding stock. Plaintiff was informed that he "was given" 10% of the total stock of the company and that he was from that point forward "deemed" a stockholder of the company. The stock was not in cancellation or satisfaction of any of the advances made by Plaintiff to the Debtor, but was a gift. Thereafter, Mrs. Kramedjian did, in fact, transfer her stock as contemplated, but no stock certificates were ever transferred to Plaintiff as promised.

11. During October, November and December of 1979, the Debtor's cash flow shortages were so severe that the Debtor approached Dimmett & Owens for permission to "pre-factor" certain sales. This meant that the Debtor would sell an invoice to the factor even though the goods represented by the invoice had yet been shipped to the Debtor's customer. The Debtor found it necessary to do this because it did not have sufficient cash to purchase the necessary inventory to fill the orders as they came in from customers. Dimmett & Owens apparently consented to this procedure on an approval basis for specific orders with the understanding that such orders would be filled within just a few days after the invoice was pre-factored. While the Debtor at first abided by this procedure, it eventually ceased obtaining the factor's permission and began pre-factoring invoices without disclosure to the factor. As of the date of the filing of the petition, some of the orders for these pre-factored sales have been cancelled and numerous others are more than 90 days old. According to records prepared by former employees of the Debtor on the basis of information supplied by Dimmett & Owens, the total outstanding amount of pre-factored invoices as of December 31, 1979 was about $240,000. Mr. Kay admitted that he knew that this prefactoring was occurring and consented to it.

12. Also during October, November and December of 1979, the Debtor began to write checks on insufficient funds. Mr. Kay knew that this was being done and consented to it. As of December 31, 1979, there were more than $78,000 in checks issued by the company and returned for insufficient funds. The Debtor's management knew when these checks were written that there were not funds in its account sufficient to cover the checks.

13. The Debtor currently has some $20,-000 which it withheld from employees' wages but failed to remit to the federal government as withholding taxes, which fact Mr. Kay knew and consented to as a principal officer.

14. Managerial responsibilities for the Debtor were divided among the three officers as follows: Mr. Kay was in charge of Sales (which had some 10 employees), Mr. McCauley was in charge of Research & Development (which had some 3 to 4 employees), and Mr. Adkins was in charge of Operations (which had some 55 employees). Mrs. Kramedjian apparently issued payroll checks and handled odd jobs from time to time. Despite the initial inadequate capitalization and short-fall of cash flow from the beginning, despite this shaky financial condition of the company, the management team paid themselves from the outset of the organization of the company what must be considered under the circumstances to be excessive compensation. Mr. Kay resided in a penthouse condominium in Colony Square, which his mother purchased, but the Debtor paid the monthly mortgage payments. Mr. Kay stated that the penthouse, which prior to being purchased was rented with the monthly rental of $1,400 paid for by Sunrise, was regularly used for "business

174

purposes", such as meetings of officers. In addition, the Debtor's officers used automobiles paid for by the company with insurance paid for by the company. Mr. Kay testified that their salaries and benefits ranged from about $40,000 annually for Mr. Kay to $35,000 and $30,000 for other officers. It appears that Mr. Kay's mother was paid somewhere between $14,000 to $20,000 in salary and benefits for handling the payroll and other odd jobs.

15. Mr. Kay himself admitted, and a number of witnesses who preceded him testified, that the Debtor's affairs had been mismanaged. There was some evidence given by current employees of the Debtor that Mr. Kay is a good "marketing man" and sales and idea and imaginative person and that Mr. McCauley is a highly "artistic-creative" person, and that both officers are well-suited for the jobs in their respective areas of primary responsibility. But the evidence demonstrates that Messrs. Kay and McCauley were not good financial analysts or business planners or business managers. Mr. Kay had a "falling out" with Mr. Adkins over business philosophy and the direction in which the Debtor's business should be pointed. But Mr. Kay stated that Mr. Adkins, who had worked with Mr. Kay as early as the time of Kaymac Distribution, was honest, hard working and competent in his area of responsibility. Mr. Adkins was discharged from his position of Vice-President and Board member at a shareholders' meeting held shortly before the Debtor filed its petition herein. Current management of the Debtor, consisting of Mr. Kay and Mr. McCauley, also claim to be creditors of the Debtor by reason of loans allegedly made by them to the company. Mrs. Kramedjian also is purportedly a creditor of the Debtor.

16. It appears that, shortly before the Debtor and Impulse filed their petitions herein, they paid their pre-bankruptcy counsel some $16,000, presumably on account of an antecedent debt.

CONCLUSIONS OF LAW

1. In a Chapter 11 case, under the Bankruptcy Code (11 U.S.C., Chapter 11), the presumption is that the debtor will continue in possession and that current management will continue to manage the debtor's affairs. The Code expects the debtor in possession to be the norm. The presumption arises from a belief that the debtor and current management are generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate. The mere fact of filing for debtor relief under the Bankruptcy Code, the fact of insolvency, which may ensue as a result of any number of factors independent of the abilities and integrity of current management, does not demonstrate that the debtor is incapable or unsuited to superintend its own reorganization. Indeed, slight evidence of mismanagement in the form of imprudent or poor business decisions or use of resources are to be expected and will not alone overcome the presumption of a debtor in possession. However, Section 1104(a)(1)[1] of the Bankruptcy Code provides that the Court must order the appointment of a trustee "for cause" found. The term "cause" is defined to include "fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case." The Court may also appoint a trustee if such appointment is "in the interests of creditors" or other interests of the estate. 11 U.S.C. § 1104(a)(2).[2]

1. 11 U.S.C. § 1104(a)(1). "(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee—
(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current manage-ment, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor. . . ."

2. 11 U.S.C. § 1104(a)(2). "(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the

2. Current management of the Debtor has demonstrated its incompetence to run the business affairs of the Debtor. The Court finds and concludes that, while the business enterprise has rehabilitative possibilities, has product and sales appeal in the marketplace, and while the current management has imaginative, creative and sales marketing talents, possibly of considerable scope, the evidence is clear that this current management has grossly mismanaged the Debtor from the outset. While current management may bring talents to the business that may contribute to its success, their fiscal and operational abuses convince the Court that they lack the business acumen and discipline to institute the fiscal and managerial controls and procedures necessary to turn this enterprise around. Mr. Kay and other witnesses testified at length about what an excellent product the Debtor has, the fact that the Debtor is essentially without competition, and the unique marketing concept the Debtor has so successfully employed. If this all be true, then one can only lay at the door of management the utter failure of this business to succeed and must attribute this lack of financial success to gross mismanagement and incompetence. Nor can the Court ignore the fact that this is the third company which Mr. Kay has managed and which has gone through bankruptcy.

■ In response to the undisputed testimony of mismanagement and spending excesses demonstrating management incompetence, the debtor's offer of testimony by current management, concerning operational changes and plans which management proposes immediately and in the near-term in its attempts to cure such deficiencies and to rehabilitate the debtor, was denied by the Court as being neither relevant nor admissible to the issues under Section 1104(a)(1). While relevant and appropriate at a meeting of creditors and at a hearing on confirmation of a plan, such self-serving testimony as to how past and current management intends to improve management and operational actions is mere speculation and not relevant to the issues of whether past management actions require the appointment of a trustee under Section 1104(a).

■ It is only the prior actions of the debtor's management that are relevant to the motion. The question presented in a Section 1104(a) motion is whether the pre-motion acts or omissions of current management (whether committed before or after filing of the debtor's petition), reflected against the criteria of Section 1104(a)(1) supply the cause to require the appointment of a trustee to protect the debtor's assets for creditors and to guide the debtor's actions in the near future while a plan can be formulated and proposed. Future plans, revealed by current management through testimony or much harder evidence, will not condone past management frauds, dishonesty, gross mismanagement, or incompetence so as to overcome the statutory requirement of Section 1104(a)(1) for the appointment of a trustee. Recognizing that as surely the past is prologue and as leopards do not erase their spots, so this Court doubts that Mr. Kay can forthwith alter his pattern of monetary favor and extravagance to himself, his mother-creditor, and his officer staff. Nor is Mr. Kay and current management likely to be able to adequately satisfy the immediate requirements of creditors, suppliers and customers while this case is pending, without external direction and support.

3. Men in desperate situations do desperate things. Such appears to be the case with current management of this Debtor in coping with financial straits. It is undisputed that they were aware of, directed or sanctioned acts which, if not constituting fraud, were deceptive and in wanton and reckless disregard of the financial reality of

court shall order the appointment of a trustee—

. . . . .

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor."

the business and its creditors, and, therefore, are dishonest in nature and very troublesome to the Court in consideration of this motion. Financial controls or planning were totally absent. Furthermore, the Court cannot help but believe that, without an overseer of the business affairs of this Debtor, the enterprise lacks managerial and operational credibility, and essential suppliers may decline further dealings with the Debtor, either because of past unpleasant experiences with current management or because of a distrust of such management altogether. Only an independent and business-wise trustee can supply the leadership and credibility needed by this enterprise to salvage its possibilities.

4. Other "causes" under paragraph (1) of Section 1104(a) suggest a trustee in this case. The co-mingling of the affairs of the Debtor and Impulse require an independent review and examination. Transactions between the Debtor and current management in the form of loans purportedly made by them to the company need to be inquired into. The financial benefits accorded to Mr. Kay's mother, a substantial creditor and a paid employee, suggests inspection and review. Furthermore, transactions between the Debtor and its pre-bankruptcy counsel seem worthy of independent impartial examination.

5. Finally, pursuant to subsection (a)(2) of Section 1104, the court concludes that the actions of current management and the turmoil caused by officer disputes and internal management conflicts suggest that the protection of the Debtor's assets and the interests of creditors and other parties in interest would be better served by the appointment of a trustee herein than continuation of a debtor in possession.

6. In conclusion, it seems obvious to this Court that the interests of creditors, the interest of the estate, demands a security blanket, a fiduciary protective shield, from the possibility of continued financial excesses by current promotional and sales oriented management. Creditors' interests and the estate's interest require elimination of waste and exorbitant expenses and the institution of a system of financial controls of marketing, production, inventory and expenses which can only be supplied by fresh, competent, unbiased management in the form of a trustee, unrestricted by the inertia of past policy and limited business planning, financial experience and discipline of current management. The estate obviously needs a properly experienced, firm, clear-headed, far-sighted helmsman to chart an altered, cautious and steady course, with full command of the bridge, power, rudder, manifest, cargo and crew, if the crosswinds and heavy seas of adversity presently confronting this business enterprise are to be successfully traversed.

A businessman trustee will be appointed.

7. While the debtor in possession may be the norm, the facts here require the exception. A trustee is demanded and will be appointed.

Judgment on the foregoing findings of fact and conclusions of law was entered on February 11, 1980.