**In re ANNISTON FOOD–RITE, INC., d/b/a Commissary Warehouse, Debtor.**

**In re Max HIGGINS, Debtor.**

**Bankruptcy Nos. 82–02276, 82–02287.**

United States Bankruptcy Court, N. D. Alabama.

June 1, 1982.

Thomas J. Knight, Anniston, Ala., for debtors.

Guy Sparks, Anniston, Ala., for John W. Owens.

Charles S. Doster, Anniston, Ala., for Associated Grocers Co-op, Inc.

FINDINGS OF FACT, CONCLUSIONS BY THE COURT, AND ORDER ON REQUESTS FOR APPOINTMENT OF TRUSTEES

L. CHANDLER WATSON, Jr., Bankruptcy Judge.

Each of the above-styled cases was commenced by a voluntary petition under Chapter 11, Title 11, United States Code, and remains pending in this Court under said Chapter 11. In the case of Anniston Food-Rite, Inc. (hereinafter usually referred to as Food-Rite) applications requesting the Court to order that a trustee be appointed, pursuant to 11 U.S.C. Section 151104(a) were filed by John W. Owens (hereinafter usually referred to as Owens) and by Associated Grocers Co-op, Inc. (hereinafter usually referred to as Co-op) and a like application was filed by Owens in the Max Higgins (hereinafter usually referred to as Higgins) case. After notice by mail to the debtors, the creditors, and other parties in interest, the debtors requested hearings upon said applications, which were then consolidated for the purpose of disposition by the Court, and a hearing upon said applications was commenced before the Court on May 10, 1982. Various witnesses were examined before the Court and various documents introduced into evidence, with the hearing concluded on May 11, 1982, and the matter has now been argued and submitted to the Court for a decision.

## FINDINGS OF FACT

Taking judicial knowledge of the matters reflected in the case files, to the extent assumed by the parties at the trial, and upon a due consideration of the evidence presented to the Court, the bankruptcy judge finds the following facts:

1. Owens was the owner of the capital stock of Food-Rite and the capital stock of Lenlock Foods, Inc. (hereinafter usually referred to as Lenlock), each being a corporation which had as its sole business the operation of a retail grocery store or "supermarket". Each continues to be solely engaged in this activity, with the Food-Rite store being located near the downtown area of the City of Anniston and with the Lenlock store being located in a small business community in the northern part of town and adjacent to Fort McClellan, a United States Army training base.

2. On February 11, 1980, Higgins acquired by purchase from Owens the entire stock of both corporations, in a transaction by which the purchase was financed entirely by credit extended from Owens to Higgins. A sum in excess of $197,000.00 is still owed on this transaction according to an admission of Higgins filed in a suit in the local State Circuit Court, but Higgins now does not admit owing as much as that on the contract.

3. Shortly prior to the sale, the transaction was halted because Commercial National Bank of Anniston was in the process of foreclosing a mortgage, securing a large sum of money, upon the inventory and equipment of each store, but the bank later refinanced the indebtedness in connection with the sale of the capital stock from Owens to Higgins.

4. Higgins had no prior experience in managing or operating a grocery store but was the owner, with his family, and operator of a retail furniture business in a nearby town. Higgins and his family liquidated the furniture business and received therefrom a net sum of about $100,000.00, which was used to pay bills at the grocery stores and to pay upon notes at banks (whose notes, not being stated).

5. Approximately $25,000.00 of the money from the furniture business was required to bring current the rent payments and the utility bills at the two stores. As a condition to continuing the electric service to the grocery stores, the utility company required that a payment-guaranty bond in the sum of $10,000.00 be posted. At the time of purchasing the stock from Owens, Higgins had not been aware that the corporations were as heavily indebted to the utility company, as he later found out.

6. In connection with the sale of the stock, Owens required Higgins to furnish a personal financial statement. A good many

years earlier, Higgins had furnished his financial statement to a bank, with which he continued to do business as a borrower, and the statement had been periodically "updated" [redated?] by the bank, and Higgins complied with Owens' request by obtaining and furnishing a copy of the financial statement held by this bank. This financial statement was substantially false in that it showed Higgins to be the owner of real estate valued at $175,000.00, although he had conveyed his interest in the real estate to his wife. The financial statement, which showed Higgins to have a net worth of approximately $242,000.00, was relied upon by Owens in reaching the decision to make the credit sale of the stock to Higgins.

7. Higgins manages the Food-Rite store, and his wife manages the Lenlock store. They each work approximately 100 hours per week, seven days a week, in the two stores. Two of their daughters and one son are employed in the businesses and receive compensation of $4.00 per hour. One daughter and that son are employed at the Lenlock store. The other daughter and an older son, who is paid $350.00 per week, are employed at the Food-Rite store, and that son is the secretary of Food-Rite. Food-Rite has a total of six or seven store employees.

8. Almost all of Food-Rite's purchases for its inventory are made from suppliers who require payment upon delivery of the merchandise or produce purchased; however, during its prior course of dealings with Co-op, a series of checks were drawn and given by Food-Rite to Co-op, and these checks were dishonored, for "insufficient funds", by Food-Rite's bank. Both Higgins and the people connected with Co-op knew that the checks were not good when drawn and delivered; but both expected the checks to be honored when presented for payment or within a reasonable time thereafter. Food-Rite's bank account "float" eroded substantially due to a large drop in sales by Food-Rite, resulting in non-payment of the checks. The checks total approximately $50,000.00, but at the time of the hearing this had been paid down to approximately $30,000.00.

9. At least to (perhaps through) February, 1982, Food-Rite engaged in a practice of paying common suppliers of merchandise or produce to both stores for the merchandise or produce delivered to both stores. This effected a transfer of funds from Food-Rite to Lenlock of approximately $80,000.00, according to the estimate of Owens, who has been a public accountant for twenty years, and based upon looking at the records of the two corporations.

10. The Commercial National Bank of Anniston still holds a security interest in the inventory and equipment of each corporation, as security for the payment of the balance of the debt refinanced when the corporate stock was sold by Owens to Higgins. This debt is being paid at the rate of $1,500.00 per month, plus interest (at a floating rate) of approximately $2,400.00 to approximately $3,200.00. The balance of this debt is now approximately $60,000.00. This debt and a debt owed to "Citibanc" (presumably a debt on which both corporations are liable) is being paid by Lenlock.

11. Also, Higgins is drawing no money from, and is not being paid a salary by, Food-Rite but is drawing from, or is being paid by, Lenlock at the rate of $300.00 per week.

12. The gross sales at the Food-Rite store have been reduced by the current economic recession from $35,000.00 to $40,000.00 weekly down to approximately $14,000.00 per week. Last month Food-Rite had sales of approximately $40,000.00 and paid out approximately $35,000.00.

13. Higgins stated that he did not know the total of the debts owed by Food-Rite but that the figure was not over $500,000.00. The debts owed by Lenlock were approximately $140,800.00. Higgins estimated the Food-Rite inventory to fluctuate from $90,000.00 to $110,000.00 [whether retail or wholesale value not being stated]. Higgins stated that he had no idea of the value of the equipment at the Food-Rite store and did not know how many suits were pending against it, not being able to state whether over seven or over ten. Hig-

gins stated that the total debts owed by Food-Rite at the time of his purchase of its stock amounted to $500,000.00 plus an electric bill of $10,000.00 to $12,000.00.

14. No transfer had been made by Higgins of the capital stock of either corporation, the stock certificates were at his residence, he had no plans to do anything with the capital stock, and the shares of the two corporations constituted his principal assets.

## CONCLUSIONS OF LAW

The matter of whether the Court shall order that a trustee for the debtor be appointed is governed by 11 U.S.C. § 151104(a) [§ 1104(a), in districts not having a United States trustee].[1] A Chapter 11 plan has not been confirmed in this case, meeting the first condition of the statute for an order directing that a trustee be appointed.

It is recognized as elementary that Congress intended and that Chapter 11 provides that the debtor shall remain in possession and control of the debtor's assets and business, without the intervention of a trustee and the interruption—even disruption—to its business affairs, unless a party in interest calls upon the Bankruptcy Court, for sufficient cause, to adjudicate that an abnormality exists, requiring the appointment of a trustee.[2] Most would also agree that some evidence of managerial incompetence or of mismanagement could be demonstrated in the average case under Chapter 11 which would not rise to the level of the "cause" contemplated by the statute for the appointment of a trustee.[3] This does not mean, however, that the statute does not raise difficult questions of interpretation and application.

At its conceptual stage, the appointment of a trustee in a Chapter 11 case was to be based upon two foundations, one being the need or cause for the appointment of a trustee in the case and the other being a consideration of the costs and expenses incident to having a trustee in the case.[4] These two considerations were to be weighed together by the Court in making its decision. As enacted, these two considerations were disjoined and made independent grounds for the appointment of a trustee, with the expense factor broadened to the test of the best interests of creditors, any equity security holders, and other interests of the es-

1. § 151104. Appointment of trustee or examiner.

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

2. *In re Sea Queen Kontaratos Lines, Ltd.*, 7 B.C.D. 601, 10 B.R. 609, B.L.D. ¶ 68009, 4 C.B. C.2d 491 (Bkrtcy.Me.1981); *In re La Sherene, Inc.*, 3 B.R. 169 (Bkrtcy.N.D.Ga.1980); 3 Norton, *Bankruptcy Law and Practice*, § 53.01 (1981).

3. *In re Sea Queen Kontaratos Lines, Ltd.*, and *In re La Sherene, Inc., Supra* note 2; 5 *Collier on Bankruptcy* ¶ 1104.01[7][c] (15th ed. 1979). The Court notes that it is "gross" mismanagement of the affairs of the debtor which is cause for the appointment of a trustee, not just mismanagement.

4. ... The court is permitted to order the appointment of one trustee at any time after the commencement of the case if a party in interest so requests. The court may order appointment only if the protection afforded by a trustee is needed and the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded....

The second test, relating to the costs and expenses of a trustee, is not intended to be a strict cost/benefit analysis. It is included to require the court to have due regard for any additional costs or expenses that the appointment of a trustee would impose on the estate. H.R.Rep.No.95–595, 95th Cong., 1st Sess. 402 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. See *Collier on Bankruptcy* ¶ 1104.01[6] (15th ed. 1979).

tate.[5] It is, of course, difficult to imagine that a court would be able to find the "cause" for the appointment of a trustee and that it would not be in the interests of the creditors and other protected interests, although it has been suggested that mediocre management might not be sufficient "cause" for the appointment of a trustee but that the Court might determine that a trustee could provide superior management and that the appointment then would be in the interests of the creditors and other protected interests.[6] This effort at explaining the statute shows commendable imagination, but it is difficult further to imagine that such a case will be reported by the courts—except, possibly to the extent of proving the point.

In discussing the language and meaning of the first of the alternate grounds for the appointment of a trustee in a Chapter 11 case, it has been stated that Section 151104 [or Section 1104] does not permit the Court to order the appointment of a trustee solely on the ground that current management has mismanaged the debtor's affairs.[7] This appears to be an erroneous interpretation, for the statute clearly lists fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, "either before or after the commencement of the case," or similar cause.

In considering the application of the statute to the facts in these cases, the Court notes the following circumstances:

1. There was an actual fraud committed by Higgins in purchasing the stocks of the two corporations. The financial statement which he furnished to Owens was substantially false in showing an asset of real property previously deeded by him to his wife. Whether the fraud was intentional is arguable. It would not have any bearing upon the matter before the Court, however, if it were not for the fact that Higgins embodies "management" in these two cases. The fraud had nothing to do with and does not directly affect the management of the business and affairs of the two debtors. It does appear to have an indirect bearing, in that it shows that Higgins, at best, is insensitive to, or ignorant of, ethical and good faith dealings in business transactions. This occurrence, then, is a factor to be placed in the balances but certainly is not decisive of the issue in these cases.

2. The payment by Food-Rite for the purchase of groceries and other merchandise partly delivered to it and partly delivered to Lenlock constitutes a dissipation of the assets and resources of Food-Rite, in fraud of its creditors, when done without any clear sufficient consideration. The only sufficient consideration which the Court can find is certainly not clear, that being the fact that Lenlock is making the payments on the Commercial National Bank debt, secured by property of each corporation, and is presumably paying a second debt for which Food-Rite may have some liability. The practice by Food-Rite of paying joint trade debts for the two stores was shown to have continued either to or through February, 1982, and to have effected a transfer to Lenlock of an estimated $80,000.00. Whether the practice continued to the time of the trial was not the subject of any inquiry at the hearing, as far as the Court recalls. There are two points to consider here. If the transfers were made for a good and sufficient cause, Food-Rite (or Higgins) should have described and explained the consideration. Also, if the practice by Food-Rite had stopped prior to the hearing, the debtor should have brought this out. Once the transfers were established as taking place, being improper on their face, the burden of going forward with a satisfactory justification or of showing a cessation rested upon the debtor. An inference may be made, in the absence of refutation by the debtor, that Higgins is manipulating the two corporations so as to transfer trade debts from Lenlock to Food-Rite, which, if it encounters a financial de-

5. See 5 *Collier on Bankruptcy* ¶ 1104.01[7][d] (15th ed. 1979).

6. *Id.*

7. *Id.* ¶ 1104.01[7][c].

mise, will take with it some of Lenlock's financial burdens and leave Higgins as owner of the store of Lenlock, which then will be relatively free of trade debts. Also, this practice, if unsupported by an adequate consideration, contributes to the weight of Food-Rite's debts and may cause it to sink rather than to remain afloat, as it otherwise might have done. Under any circumstances, this practice is an unsound business practice and demonstrates business incompetence and mismanagement of the debtor's affairs.

3. The observation is inescapable that Higgins and his wife are working "like Egyptian slaves" at the two grocery stores, that Lenlock is not in any worse financial condition than it was at the time that its management was assumed by Higgins, that the general economic recession makes it difficult to operate Food-Rite's business in such a way as to satisfy all of its obligations to its creditors, and that Higgins is operating the day-to-day grocery business of Food-Rite in a manner which would not justify his removal and the substitution of a trustee to control its affairs. Higgins does not, however, evidence a grasp of the elements of Food-Rite's general financial condition. He did not know how many suits in court had been brought against it, was vague about its total indebtedness and the details of some of its debts, and had no idea of the value of its equipment. If all of this is taken together, it would be arguable as to whether the operation of Food-Rite's grocery business would be substantially improved by the insertion of a trustee into its affairs and whether any benefit therefrom would justify the expense and the business disruption of the operation of the grocery store.

4. As far as the Court can find from the evidence, Higgins has not done anything improper with his principal assets, being the shares of capital stock of the two corporations, and does not contemplate any incumbrance or disposition of this property. In his personal Chapter 11 case, any use or sale of this property would not be in the ordinary course of business and could be accomplished only "after notice and a hearing," as provided in 11 U.S.C. § 363(b).

In the case of *In re Main Line Motors, Inc.*,[8] the Court states that a determination as to whether a trustee should be appointed "compels the Court to resort to its broad equity powers", that rigid absolutes should be avoided, and that the Court should look to the practical realities and necessities involved in reconciling competing interests. It states that these equitable considerations are more applicable under subpart (a)(2) than under subpart (a)(1) of the statute in question, and that where the appointment of a trustee is sought for "cause . . . , the court's discretionary powers are necessarily more circumscribed." The Court goes on to say that various considerations and competing interests must be carefully weighed under either subpart of Section 1104, "because the appointment of a trustee is an extraordinary remedy."[9] The statute as finally enacted does not seem fully to warrant these conclusions. As indicated, the statute appears to lay down two individual grounds, either of which (considered separately) will warrant the appointment of a Chapter 11 trustee. It may be that Congress felt that a finding that the appointment of a trustee would be in the interests of creditors, any equity security holders, and other interests of the estate might not be held by some courts to be a sufficient ground or "cause" for the appointment of a trustee. If so, this might have been taken care of by including it within the causes listed; but, perhaps, it was felt that this was not "cause" in the sense that the word is used in Section 1104(a)(1), including within its scope fraud, etc. Whatever the reason for the present division of the statute into two separate grounds for the appointment of a trustee, the Court concludes that sufficient cause for the appointment of a trustee is shown under the first part of subsection (a) of the statute, in the Food-Rite case.

**8.** 7 B.C.D. 594, 9 B.R. 782, B.L.D. ¶ 68046 (Bkrtcy.E.D.Pa.1981).

**9.** *See In re Hotel Associates, Inc.*, 6 B.C.D. 160, 3 B.R. 343, B.L.D. ¶ 67597 (Bkrtcy.E.D.Pa. 1980).

In addition, it appears to the Court that it would be in the best interests of the creditors (there being no other protected interests involved in this case). It certainly is not in the best interests of the creditors for Higgins to manage Food-Rite in such a manner as to decrease the trade debts of Lenlock at the expense of Food-Rite and with a resulting increase in Food-Rite's trade debts. The zeal shown and the effort expended by Higgins in trying to make the grocery store business of Food-Rite continue to operate does not negative the Court's conclusion. If he has any fraudulent intent concerning the intertwining of the two corporation's finances, the scheme will be promoted by keeping Food-Rite afloat. If Higgins has no such intent, the ultimate effect upon the creditors is still deleterious, for the payment by Food-Rite for groceries and other merchandise delivered to Lenlock obviously increases the financial burden carried by Food-Rite. In the most favorable light, the management of Food-Rite by Higgins reminds one of an overburdened vessel struggling in heavy seas, with the captain and the crew making a frantic effort to keep the pumps running at a pace to stay ahead of the incoming sea but also with the vessel floundering and without noticeable headway or consistent direction.

The Court concludes that the evidence and the statute taken together require that the Court order that a trustee be appointed in the Food-Rite case but that the evidence does not support the appointment of a trustee in the Higgins case.

### ORDER OF THE COURT

In view of the foregoing, it is ORDERED by the Court that the application for the appointment of a trustee in the Max Higgins case is denied, that the application for the appointment of a trustee in the Anniston Food-Rite, Inc., case is granted, that the United States trustee for the Northern District of Alabama, is authorized and directed to appoint a trustee in the Anniston Food-Rite, Inc., case, No. 82–02276, and that a copy of the foregoing shall be sent through the United States mails to each of

the following (which shall be sufficient service and notice hereof): the attorneys for the applicants, the attorney for the debtors, the United States trustee for this district, the United States attorney for this district, and Max Higgins.