**In re SHARON STEEL CORPORATION,**
Debtor.

**Bankruptcy No. 87–207E.
Motion No. 87–1019.**

United States Bankruptcy Court,
W.D. Pennsylvania.

May 2, 1988.

Campbell & Levine, Pittsburgh, Pa., for debtor.

Haythe & Curley, Michael Blumenthal, New York City, for DWG Corp.

Mansmann, Cindrich & Titus, Paul H. Titus, Pittsburgh, Pa., for DWG Corp. and Victor Posner.

Rose, Schmidt, Hasley & DiSalle, Lawrence Palmer, Pittsburgh, Pa., for trustee, James Toren.

Steven Goldring, Pittsburgh, Pa., Asst. U.S. Trustee.

Arthur Linker, New York City, for I. B. J. Schroder, Rosen, Mann & Colin.

## OPINION ON APPOINTMENT OF A TRUSTEE

WARREN W. BENTZ, Bankruptcy Judge.

### I. Introduction

Sharon Steel Corporation ("Sharon" or "debtor") filed its voluntary petition under Chapter 11 of the Bankruptcy Code on April 17, 1987. Its schedules show $742 million in liabilities and $478 million in assets.[1]

Sharon is a steel maker, with blast furnaces and principal manufacturing equipment located in the vicinity of Sharon, Pennsylvania. It has some 28 subsidiary corporations, although not all are active. Sharon is controlled and principally owned by a Mr. Victor Posner ("Posner") through various affiliated companies. Its executive offices, essential management departments, cash inflow and outflow control, receivables and payables have been maintained at the Miami, Florida headquarters of other Posner corporations on a cost-sharing basis.

The Official Committee of Unsecured Creditors ("Creditors Committee" or "Committee") on September 28, 1987 filed a motion for the appointment of a trustee under § 1104. Evidentiary hearings and arguments were heard October 15 and November 3, 1987.

Negotiations on an amicable resolution, which would have provided independent management, terminated and on January 11, 1988, an order was entered directing the U.S. Trustee to appoint a reorganization trustee. After argument on a motion to reconsider, we entered an order on January 15, 1988 approving the U.S. Trustee's appointment of James W. Toren as trustee in this case. That order, by necessary inference, disposed of the motion for reconsideration and motions to enforce an alleged settlement stipulation, as made clear by order of March 4, 1988.

The issues decided by the orders of this court directing and approving the appointment of a trustee were:

1) Whether a trustee should be authorized and appointed in this Chapter 11 case under 11 U.S.C. § 1104(a)(1) or § 1104(a)(2).

2) Whether the court should have compelled the enforcement of a stipulation which was still in the process of negotiation; and

3) Whether sufficient grounds existed to vacate the January 11, 1988 order authorizing the appointment of a trustee as requested in the various motions for reconsideration.

### II. Applicable Law

The appointment of a trustee is governed by 11 U.S.C. § 1104, which provides:

"(a) At any time after the commence-

---

1. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9013 and mandated by the Honorable Donald E. Ziegler, United States District Judge, on appeal, with respect to our order dated January 15, 1988, which approved James W. Toren as trustee and necessarily denied a motion to vacate our January 11, 1988 order authorizing the appointment of a trustee.

ment of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross management of the affairs of a debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

A succinct discussion of the applicable principles and standards under § 1104 is contained in *In re Parker Grande Development, Inc.*, 64 B.R. 557 (Bankr.S.D.Ind. 1986). The relevant portions are as follows:

[1] Chapter 11 is designed to allow the debtor in possession to retain management of the business operations unless a party in interest can prove that the appointment of a Trustee is warranted. *In re BAJ Corp.*, 42 B.R. 595 (Bkrtcy.D. Conn.1984); *In re General Oil Distributors, Inc.*, 42 B.R. 402 (Bkrtcy.E.D.N.Y. 1984); *In re La Sherene, Inc.*, 3 B.R. 169 (Bkrtcy.N.D.Ga.1980).

[2] The appointment of a Trustee in a Chapter 11 case is an extraordinary remedy which should not be granted lightly, as it may impose a substantial financial burden on a hard-pressed debtor seeking relief under the Bankruptcy Code. *In re General Oil Distributors, Inc., supra; In re Hotel Associates, Inc.*, 3 B.R. 343, (Bkrtcy.E.D.Pa.1980).

[3] Furthermore, the party seeking the appointment of a Trustee in a Chapter 11 case bears the burden of proving by clear and convincing evidence that such appointment is necessary. *In re General Oil Distributors, Inc., supra.*

[4] A debtor-in-possession has all the rights and duties of a Trustee in a Chapter 11 case. *In re Hawaii Dimensions*, 47 B.R. 425 (Dist.Ct.Hawaii, 1985); *Sabre Farms, Inc. v. Bergendahl*, 42 B.R. 649 (D.Or.1984). The duties of a debtor-in-possession, therefore, include the duty to protect and to conserve property in his possession for the benefit of creditors. *In re Devers*, 759 F.2d 751 (9th Cir.1985). [5] Furthermore, a debtor-in-possession is a fiduciary of his creditors. *In re Van Brunt*, 46 B.R. 29 (Bkrtcy.W.D.Wisc. 1984); *See also, Matter of Royal Bedding Co.*, 42 B.R. 257 (Bkrtcy.W.D.Pa. 1984). Because the debtor-in-possession stands in a fiduciary relationship with his creditors, his fiduciary obligation includes refraining from acting in a manner which could damage the estate, or hinder a successful reorganization of the business. *In re Thurmond*, 41 B.R. 464 (Bkrtcy.D.Or.1983). [*See also In re Modern Office Supply, Inc.*, 28 B.R. 943 (Bankr.W.D.Okla.1983).]

[6] Under 11 U.S.C. § 1104(a)(1), a creditor must prove the existence of fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management. However, 11 U.S.C. § 1104(a)(2) provides a flexible standard for the appointment of a Trustee. *See, In re Deena Packaging Industries, Inc.*, 29 B.R. 705 (Bkrtcy.S.D.N.Y. 1983); *In re Hotel Associates, Inc., supra*; also, *see generally 5 Collier on Bankruptcy* 1104.01 (15th Ed.1979) at 1104–17. Under 11 U.S.C. § 1104(a)(2), the Court may utilize its broad equity powers to engage in a cost-benefit analysis in order to determine whether the appointment of a Trustee would be in the interests of creditors, equity security holders, and other interests of the estate. *In re Hotel Associates, Inc., supra.* Consequently, the analysis becomes one of whether the cost of appointing a Trustee is outweighed by the benefits derived by the appointment.

\* \* \* \* \* \*

[7] In order to determine the benefits of appointing a Trustee [under subsection (a)(2)], a close and careful scrutiny of a debtor-in-possession's prior and present conduct must be made and from that a

determination must be made that a Trustee will accomplish the goals of the Chapter 11 Plan more efficiently and effectively. This examination makes critical an assessment of the overall management of the debtor corporation; the experience, skills and competence of the debtor-in-possession both past and present, and the trust and confidence in the debtor-in-possession by members of the business community with whom debtor-in-possession has had business transactions and must, of necessity, continue to have the same.

64 B.R. at 560–561.

Under § 1104(a)(1), the words "or similar cause" and § 102(3) indicates that the grounds for appointing a trustee are not limited to those specifically enumerated. *See e.g., In re Brown,* 31 B.R. 583 (D.Col. 1983); *In re Denrose Diamond,* 49 B.R. 754 (Bankr.S.D.N.Y.1985); *In re Ford,* 36 B.R. 501 (Bankr.W.D.Ky.1983); *and In re Main Line Motors, Inc.,* 9 B.R. 782 (Bankr. E.D.Pa.1981).

In reported opinions, the most common basis for appointing a trustee under § 1104(a)(1) is for gross mismanagement and incompetence. *See In re Paolino,* 60 B.R. 828 (E.D.Pa.1986); *In re Horn & Hardart Baking Co.,* 22 B.R. 668 (Bankr.E.D. Pa.1982). The various factors used to determine whether current management is guilty of gross mismanagement and incompetence will vary depending on the facts of the individual case. A summary of two cases provides clarification.

In *In re La Sherene, Inc.,* 3 B.R. 169 (Bankr.N.D.Ga.1980)[2], former Bankruptcy Judge Norton listed a multitude of factors which compelled the appointment of a trustee. The court stated:

It is undisputed that [current management] ... directed or sanctioned acts which, if not constituting fraud, were deceptive and in wanton and reckless disregard of the financial reality of the business and its creditors ... Furthermore, ... without an overseer of the business affairs of this Debtor, the enterprise lacks managerial and operational credibility, and essential suppliers may decline further dealings with the Debtor, either because of past unpleasant experiences with current management or because of a distrust of such management altogether ... Only an independent ... trustee can supply the leadership and credibility needed ... to salvage [the Debtor's] possibilities.

*Id.* at 175–76. The court appointed a trustee notwithstanding the fact that current management provided certain talents which might have contributed to the debtor's success. The debtor's future plans to cure the lack of fiscal and managerial controls and procedures were also not sufficient to negate the appointment of a trustee.

In *In re Main Line Motors, Inc.,* 9 B.R. 782 (Bankr.E.D.Pa.1981), the court found sufficient cause under § 1104(a)(1) where the president and sole shareholder of the debtor had withdrawn substantial sums from the debtor's operations and placed them in control of two non-debtor affiliates. The actions of the debtor's president and sole shareholder were sufficient to constitute mismanagement and incompetence.

As a final point, we note that if there is insufficient cause to appoint a trustee under § 1104(a)(1), or if the cause cannot be proven, a trustee may still be appointed if it is in the interest of creditors, some group of equity security holders, and other interests of the estate. *See In re L.S. Good & Co.,* 8 B.R. 312 (Bankr.N.D.W.Va.1980). In general, the factors which have been the basis for appointing a trustee under § 1104(a)(2) are diverse and in essence reflect the practical reality that a trustee is needed. *See In re McCorhill Pub, Inc.,* 73 B.R. 1013 (Bankr.S.D.N.Y.1987). *See also In re Evans,* 48 B.R. 46 (Bankr.W.D.Tex. 1985); *In re William H. Vaughn & Co.,* 40 B.R. 524 (Bankr.E.D.Pa.1984); *In re Humphreys Pest Control Franchises, Inc.,* 40 B.R. 174 (Bankr.E.D.Pa.1984); *and In re L.S. Good & Co.,* 8 B.R. 312 (Bankr.N.D.W. Va.1980).

---

**2.** The Honorable William L. Norton, Jr. is the Author and Editor-in-Chief of Norton Bankrupt- cy Law and Practice, one of the leading treatises in the field.

### III. Facts and Discussion

That facts exist warranting the appointment of a trustee is amply supported by the record, largely through admissions of Sharon.

One day before filing the Chapter 11 petition, Sharon's management transferred $3.7 million by wire transfer to DWG Corporation ("DWG"). This was either for an antecedent debt, in which case it would be a voidable preference, or if the antecedent debt cannot be established, it would be a fraudulent conveyance. DWG and Sharon are under common control. Sharon has a fiduciary duty to attempt to recover such funds. Sharon management has not brought suit to recover from DWG. Indeed, it cannot—management of Sharon is the same as management of DWG.

In December 1986, four months before filing this case, Sharon management transferred an airplane of a value of not less than $750,000 and a yacht of a value not less than $750,000 to NPC Leasing Company. There were arguments that the airplane and the yacht had higher values, but the precise values need not be determined now. These transfers were prima facie voidable either as insider preferences or fraudulent conveyances. Because NPC Leasing ("NPC") is under common control with Sharon, management has not and cannot make appropriate demand and institute the litigation necessary to avoid these transfers.

On March 16, 1987, one month before filing, Sharon management transferred 141,000 shares of common stock in Chesapeake Financial Corporation to Insurance & Risk Management, Inc. ("IRM"), in a paper transaction to cancel an antecedent debt in the amount of $1,512,493.75. IRM and Sharon are under common control. The transfer is prima facie at least an insider voidable preference, and if the value of the stock was understated, is voidable as a fraudulent conveyance. Being under common control, there is no way Sharon management can or will seek to recover for Sharon the transferred stock.[3]

Sharon management argues that the above transfers were at fair value, were made to extinguish antecedent debt and may be voidable as preferences, but were not fraudulent and therefore disclose no bad conduct. However, all of the transfers were to companies under common control with Sharon. The obvious purpose of the transfers was to shield the transferred assets from Sharon's outside creditors and thereby hinder and delay recovery by them if not defeat completely any collection efforts by such creditors.

Sharon management also argues that these transfers were disclosed in its bankruptcy schedules and such disclosure "cures" the effect of such insider preferential or fraudulent transfers, even though the assets so transferred have not been returned to Sharon. We do not draw any inference of "cure" merely by such disclosure. Failure to make such disclosures would have rendered the oath to the schedules false, and could have had serious repercussions to the offending individuals and to counsel. Those transfers, made at a time of mounting financial crisis, show a manifest disdain for the interests of outside creditors.

When we issued our order directing the appointment of a trustee, no action had been undertaken by Sharon management to recover on the above causes of action. The indication is that no such action would or could be brought. First, because to do so would require the directors and officers of Sharon to authorize such suits, but those same persons are also the directors and officers of the transferee-defendant companies; such interlocking directors and officers (all under the control of Victor Posner) could not fulfill their fiduciary responsibilities to both plaintiff corporation and its creditors, and to the defendant-transferee corporations. Second, as part of the settlement negotiations, Sharon management and the Committee stipulated that the Com-

3. At this writing, the trustee has initiated action and asserts that the value of the transferred stock was $24 million.

mittee could pursue such claims. At the request of the parties, we entered an order on November 25, 1987, approving the stipulation, even though it was understood that it was to be in tandem with a stipulation for an independent board of directors which was expected to be concluded promptly. But Sharon management filed an appeal from that order, which appeal is still pending, thus revealing an intent by Sharon management to block any effort by any party to pursue such claims, even though Sharon management has a fiduciary obligation itself to prosecute those claims.

Sharon management also argues that the transferee companies have defenses to any preference or fraudulent conveyance actions which may be brought against them. But that argument ignores the fact that Sharon has a fiduciary duty to pursue such claims diligently, win or lose, and that is a duty Sharon management cannot fulfill because the persons constituting Sharon management also have fiduciary obligations to the transferee companies.

Postpetition operations of the debtor have continued to lose money. From April 17, 1987 through the commencement of the hearings on the Committee's motion in October, losses were estimated by all parties to be running at least $2 million per month, even though the market for steel had strengthened and other steel companies had improved earnings. Accurate figures on monthly losses are not available because Sharon has not been able to close its books as of April 17, 1987 and provide subsequent profit and loss information.

Sharon management has failed after nine months of operation under the protection of Chapter 11 to remedy a $4 million annual ongoing unnecessary excessive interest expense on its borrowed working capital. Sharon operates on a $30 million working capital loan on which the interest rate is 28% to 30%. The annual interest cost on that loan is $8.4 to $9.0 million. At a reasonable rate of 14% to 15%, the cost would be $4.2 to $4.5 million.

Sharon argues that it cannot accomplish refinancing because of Creditors Commit-

tee hostility, apparently urging the court to conclude that the Committee is at fault in its hostility and therefore, Sharon management should be left in place. Our view is that both management and the Committee have substantial interests at stake. Irrespective of "fault," if the conflict among the interested parties threatens the viability of the business and is detrimental to the welfare of the estate, the appointment of an independent trustee is appropriate in order to insulate the ongoing business activities from such conflict. Furthermore, this Creditors Committee is composed of very sophisticated investors and trade creditors, having in excess of $150 million at stake, and representing the holders of hundreds of millions more, and its hostility may well be justified by the prepetition transfers noted above, the postpetition failure of Sharon management to remedy such transfers, the continuing operating losses, and the other matters discussed below.

DWG is under common control with Sharon. Its offices are in Miami, Florida and it provides office space and financial management services to Sharon and numerous other companies under control of Posner. For the year 1986, DWG charged Sharon $3.58 million. Included in that annual amount is rent on the portion of the Posner building used by Sharon. Sharon management asserts that the fair rent for approximately 13,000 square feet of space occupied by Sharon is $24 per square foot. Based on the testimony, the fair rent for the space occupied is $12.50 per square foot. Thus, there is a significant overcharge as to the rent item alone. It indicates that other cost items charged against Sharon by DWG may also be excessive, such as the $122,433.31 charged to Sharon for the Chairman's office, the $74,465.53 for yacht use, the $170,483.26 for aircraft use (even though Sharon owned the aircraft and the yacht), the $230,422.28 for Victoria Plaza guest apartments, the $100,-833.21 for Waldorf Astoria usage, all of which an independent trustee might want to examine. Only an independent trustee can be in a position to evaluate the various elements of the $3.58 million annual charge and take appropriate remedial action.

Moreover, the adequacy of the accounting services being provided by Posner's Miami offices may be questioned in view of the absence of reliable postpetition monthly profit and loss statements and inability to complete the schedule of executory contracts necessary to any party contemplating a plan of reorganization. Up to November 3, 1987, Sharon had not been able to close its books as of the date of bankruptcy, April 17, 1987, so that it could not produce reliable profit and loss figures. Even a business as large as Sharon should not operate in the dark for five and one-half months after filing. Such failure may not constitute gross mismanagement or incompetence, but in conjunction with all of the other problems herein mentioned, is a basis for appointment of a trustee under § 1104(a)(2).

During 1985 and 1986 Sharon repaid debt of $294 million to four secured bank creditors. The Committee alleged, but no proofs were offered, that the purpose was to facilitate new loans from those banks to other Posner companies. Sharon argues that repayment of secured debt was necessary and proper, and that failure to pay might have precipitated this proceeding earlier. The response is that perhaps this case *should* have had judicial supervision much earlier; part of the $294 million could have been used to assure Sharon's continued existence. The court concludes that this is gross mismanagement in view of the fact that Sharon's #2 blast furnace was shut down for lack of money for relining, and #3 blast furnace, the only one operating, was nearing the end of its useful life and if it were shut down, the company would be out of the steel making business. These factors might also be considered with Sharon's losses and Posner's compensation.

That the compensation was excessive, and possibly recoverable as fraudulent conveyances, is shown by the following:

| Year | Operating Profit (Loss) | Compensation | |
|------|-------------------------|--------------|--------------|
| | | Victor Posner | Stephen Posner |
| 1983 | $17.3 million | $2,518,765 | $365,004 |
| 1984 | 6.4 million | 3,550,641 | 476,672 |
| 1985 | (53.3 million) | 3,868,445 | 515,008 |
| 1986 | (44.5 million) | 5,331,592 | 425,112 |
| 1/1/87 to 4/17/87 | (14.7 million) | 630,641 | unknown |
| 4/17/87 to 9/29/87 | (10 million, est.) | 285,658 | unknown |

This compensation includes the $4.4 million dollars that Posner caused Sharon to pay for his personal defense of criminal charges of tax evasion. That $4.4 million has never been repaid by Posner. No facts were offered to justify such compensation, or the $4.4 million.

Thus, at a time when Sharon's manufacturing facilities desperately needed repair, Posner withdrew millions of dollars for personal use and paid off $294 million in secured bank loans while putting in place, or leaving in place, a $30 million working capital loan at a 28%–30% interest per annum, allowing the facility to deteriorate, and so denuding Sharon of cash that trade credit became unavailable. Such manifest self-interest and total disregard for the welfare of Sharon and its creditors exceeds any standard necessary to show gross mismanagement.

Posner was subpoenaed for depositions in connection with the Committee's motion. He refused to appear and be deposed even though he never obtained a protective order. As the principal control person of Sharon and its affiliates, and as Chairman, President and Chief Executive Officer, he was an appropriate party to be examined. His refusal was not in good faith, and demonstrates his incompetence and gross mismanagement in that it was bound to engender creditor hostility inimical to a successful plan of reorganization.

Posner's conduct before this court also evidenced a lack of good faith. In our

opinion of October 21, 1987, explaining our order of August 19, 1987 refusing to extend the period during which the debtor maintains the exclusive right to propose a plan, we stated:

"The Committee has expressed great concern for the immediate future of Sharon, asserting that Sharon's plant is in danger of permanently shutting down. The basis for such a concern is well founded. At present, Sharon is operating inefficiently with only one blast furnace which itself is in danger of shutting down. Sharon has admitted almost from the beginning that it has two blast furnaces in need of repair. The blast furnace which is newer, larger and more efficient [# 2] is not operational and requires $18,000,000 to overhaul and reline. The other blast furnace [# 3] which is older and less efficient has been operated since it was last relined in 1979. At that time, its expected life was five years before further relining would be required. It has now operated for eight years and is in imminent danger of being shut down. If Sharon's only operational blast furnace is shut down, the result would be, in all likelihood, a shut down of major plant operations.

Sharon has shown no meaningful progress toward obtaining the $18,000,000 financing package necessary to reline the idle blast furnace and assure continued operation." *In re Sharon Steel Corp.*, 78 B.R. 762, 765–66 (Bankr.W.D.Pa.1987).

On September 18, 1987, Posner caused the debtor's counsel to hand to the court, while attending the Judicial Conference in Philadelphia, an emergency motion to approve $18 million in financing for the relining of blast furnace # 2. A keystone of the motion was:

"A. A secured loan from Victor Posner in the amount of five million dollars ($5,000,000) (the "Posner Loan")"

since $13 million could be generated from other sources. At the expedited hearing on September 25, 1987, counsel for the debtor produced Posner's written commitment; that "commitment":

1) was in the form of a letter from Sharon Steel on Sharon Steel letterhead to Sharon Steel signed by Victor Posner as "Chairman and President and Chief Executive Officer;"

2) provided only that someone (Sharon?) would "arrange for a bank or other commercial lender" to make the $5 million loan;

3) required that the loan be secured by a lien on *all* debtor's assets and its first lien must be upon property having a value of $12.5 million and be granted a superpriority lien by the Bankruptcy Court;

4) required as a pre-condition that Sharon shall have entered into a new collective bargaining agreement with the United Steelworkers of America ("USW"); and

5) provided that the loan would become due and payable upon the appointment of a trustee.

Thus, the "Posner Loan" was only a commitment by Sharon to arrange a bank loan for Sharon. Posner was committed to nothing.

The pre-condition that a collective bargaining agreement shall have been entered with USW was an attempt to coerce such agreement.

The provision that the loan would become due and payable upon the appointment of a trustee would have cut off any attempt to have a trustee appointed, since repayment of the $5 million on short notice would have been impossible for this cash-poor debtor.

The "Posner Loan" portion of the $18 million financing package for the relining of the blast furnace was therefore not seriously considered by any party, even Sharon's attorneys. When the court received the emergency motion in Philadelphia on September 18th, it was favorably impressed by Posner's willingness to lend personal funds of $5 million to aid the debtor. That impression turned sour when the $5 million disappeared in open court on September 25th.

The Creditors Committee immediately filed an amended motion, replacing the "Posner Loan" with loan commitments from various creditors, totalling $5 million. As so amended, the motion for approval of

the $18 million financing package to reline blast furnace # 2 was approved on September 29th. Thus, five and one-half months into the case, the reline job was commenced while everyone crossed their fingers and hoped the job could be completed before the one operating blast furnace failed.

Sharon management argues that it has restructured its management team, which should now be left in place. However, that was admittedly done after the Committee filed its motion for the appointment of a trustee. Even so, the ultimate control over management decisions remained unchanged, and the inherent conflicts of interest were not cured.

Attorneys for Sharon have applied for fees of $279,872.50 for the period September 28, 1987 to December 31, 1987 solely for legal work in defending the motion for the appointment of a trustee. While the equity owners are entitled to representation and to assert their rights, one must speculate whether the expenditure of such resources was appropriate, and whether Sharon's counsel in doing so was fulfilling its fiduciary duty to the debtor's estate, or was defending the private position of the equity owners. The funds expended come from the estate, and in view of the admitted insolvency, will likely be borne chiefly by creditors.

Taken as a whole, or even considering only the admissions of the debtor, it is apparent that independent management is essential to maintain the viability of the business. The court so advised the parties on November 3, 1987. The Committee preferred, however, to settle the matter by stipulation providing for independent management, presumably out of fear that the U.S. Trustee, new to this District, might appoint as trustee incapable of handling a business of Sharon's magnitude, to the detriment of all parties. (That fear, we think, has proved unjustified.) The court, therefore, allowed the parties 48 hours to complete their negotiations.

Numerous joint telephone conferences with counsel for both parties and contacts during Sharon hearings on other matters indicated that progress was being made, and the 48 hours drifted to over two months. However, in a joint telephone conference call at 5:00 p.m., Friday, January 8, 1988, Sharon's counsel advised that the parties were still negotiating and settlement appeared hopeful; Committee's co-counsel agreed that the parties were still negotiating but he advised the court that the Committee's instruction to him was to request that the court proceed with appointment of a trustee. On Saturday, January 9, 1988, the court had its first opportunity to read a four page letter from the Committee's lead counsel dated Thursday, January 7, 1988 and telefaxed to the court that day, with copies to all counsel. That letter recited the difficulties encountered in the negotiations, but more importantly stated:

"The Creditors' Committee has requested that we advise the court that negotiations concerning the Stipulation have terminated and to respectfully request that the court enter an order approving the Trustee Application."

It concluded:

"For the foregoing reasons, we respectfully request the court to enter an Order directing the United States Trustee to appoint a reorganization trustee in this case."

There having been conclusive evidence of self-dealing, transfer of huge assets to other companies under common control with Sharon and away from the reach of creditors, stripping the debtor of cash, depleting the assets of the debtor so as to require working capital loans at an unreasonably high interest rate, failure to cure the operating losses after the Chapter 11 filing, failure to have a bookkeeping system which could accurately report month to month profit or loss, all as spelled out above, the appointment of a trustee was mandatory under both § 1104(a)(1) or § 1104(a)(2). Hence, on Monday, January 11, 1988, the order was issued directing the U.S. Trustee to appoint a trustee for this case.

## IV. The Motions for Reconsideration and the Stipulation

On January 7, 1988 Posner and DWG filed a motion to enforce the November 25,

1987 stipulation, asserting that the stipulation was an enforceable agreement. That "stipulation" was incomplete; it had never been executed as to all its paragraphs; it was contingent upon approval of the court which required notice and hearing; and contained language which relieved Posner of his obligations thereunder if court approval was not obtained before December 31, 1987. That date was important because of certain perceived tax benefits to Posner if he repaid the $4.4 million before December 31, 1987. Also, the stipulation contemplated an order of approval carrying additional terms, which is where the impasse finally occurred. On January 11, 1988, there was no stipulation in existence.

Upon the entry of the order of January 11, 1988, ordering the U.S. Trustee to appoint a trustee, the negotiations which had broken down the week before were revitalized in earnest and on Wednesday, January 13, 1988, counsel jointly called to ask if argument could be heard on a motion for reconsideration. On January 14 a new stipulation now completed for the first time, was filed together with a companion motion to approve a loan; the motion to approve a loan was necessary because the new stipulation provided for Posner to lend Sharon $4.4 million (the amount of Sharon's money used to defend Posner's tax fraud case) and for DWG to lend Sharon $0.6 million. The intent was to get the $5 million to Sharon immediately as a loan, and then Posner would forgive repayment of the $4.4 million.

The motions were argued Friday, January 15. The Committee and Sharon agreed that since November, Sharon had been managed independently, that Walter Sieckman, who had been fired by Posner in the spring, was rehired in early October 1987, and since then had managed Sharon without Posner interference, that Sharon was being well and effectively managed, and that Sharon badly needed the $5 million to be provided under the stipulation. It was implied that it was almost obligatory that the January 11 order be vacated and the stipulation approved, because Sharon owed the contractor doing the blast furnace reline job $2 million and if not paid on Tues-

day, January 19th, 250 men would walk off the reline job imperiling its completion and the future of Sharon. The court did not accept gracefully this pressure argument. We viewed this calamitous forecast as evidence of bad management; effective management would not have gotten into such a predicament. The court's view was that we had better bite the bullet now, get the trustee on board, let him cope with the $2 million problem looming the next Tuesday, and prevent such crises in the future.

Also, Posner's $5 million had disappeared once before and it might do so again. As the old banker said, "Fool me once, shame on you; fool me twice, shame on me."

Having reviewed the qualifications of James W. Toren whom the U.S. Trustee had designated as trustee, and being satisfied of his competence for the task at hand, we executed our approval of his appointment that afternoon, January 15th.

Notwithstanding the difficulties of selecting counsel, and getting up to speed, the trustee was in New York arranging a loan on January 19th. (January 18th was a holiday.) An expedited hearing was arranged for Friday, January 22nd to consider a motion for approval of a loan, in part to meet the $2 million payment. On January 21st, the emergency hearing was cancelled on the advice that $5 million had been "found." The trustee had ascertained that Mueller Brass Company, a Sharon subsidiary, owed Sharon $5 million under a tax treaty and had the cash to make payment. The immediate crisis was solved. And that solution dissolved any remaining doubt as to whether a trustee is necessary in this case.

Had the January 13th stipulation been filed *before* the January 11th order to appoint a trustee, it might have been considered differently. But nothing in the stipulation, the various motions for reconsideration, or the hearings thereon disclosed any fact which preceded January 11th which was not considered in making the January 11th order. Hence, there was no basis for changing or vacating that order. *See* Bankruptcy Rules 9023 and 9024.

While we considered carefully the arguments in favor of vacating the January 11th order to appoint a trustee, in retrospect, we realize that it became public knowledge immediately that a trustee would assume command and that to reverse that order could cause substantial harm by creating an atmosphere of uncertainty, and that the order should not be vacated except upon substantial cause. Stable, reliable and respected management is essential to this debtor, and as long as the facts existed on January 11th to support the order, it should be left in place. To do otherwise would be disruptive and detrimental to the interests of all parties.

## V. Conclusions of Law

1. Sharon's prepetition transfers to DWG of

 (a) $3.7 million to DWG,

 (b) a $750,000 yacht to NPC Leasing,

 (c) a $750,000 aircraft to NPC Leasing, and

 (d) 141,000 shares of Chesapeake Financial Corporation of a value of not less than $1.2 million to IRM,

were prima facie voidable as preferences, and possibly were fraudulent conveyances to insiders or to entities under common control with the debtor, for the purpose of preserving those assets for the owners, with intent to hinder and delay creditors, constitute gross mismanagement and cause for appointing a trustee under § 1104(a)(1) and also constitute grounds for appointment of a trustee in the interest of creditors, non-controlling equity security holders and other interests of the estate under § 1104(a)(2).

2. The transfers of $9.8 million to Victor Posner and $940,000 to Stephen Posner, his nephew, in 1985, 1986 and January–March 1987, were not shown to be for an adequate consideration, and prima facie constitute fraudulent conveyances; none of such funds have been repaid to Sharon, and since Victor Posner is also the control person, only an independent trustee for Sharon can effect an appropriate remedy. Such action constitutes gross mismanagement

and cause for appointing a trustee under § 1104(a)(1) and § 1104(a)(2).

3. The failure of Sharon management to pursue recovery of insider preferences and fraudulent conveyances, and its apparent inability to do so because of conflicts of interest, is a violation of its fiduciary duty, amounts to gross mismanagement and warrants the appointment of a trustee under either § 1104(a)(1) or § 1104(a)(2).

4. The debtor's inability to extricate itself from a 28%–30% interest expense on its working capital loan, costing it over $4 million per year in *unnecessary* interest constitutes gross mismanagement pre- and postpetition and is cause for appointing a trustee either under § 1104(a)(1) or § 1104(a)(2).

5. The necessity for the high interest working capital loan was created by payment in 1985 and 1986 by Sharon of $294 million to four secured bank creditors, by continuing losses, and by withdrawals and transfers to Posner and Posner-controlled companies; such practices constitute gross mismanagement and cause for appointing a trustee under § 1104(a)(1) or § 1104(a)(2).

6. The repayment of $294 million to secured bank creditors and the transfers of substantial sums to Posner and Posner companies, leaving Sharon with inadequate cash when it needed to refurbish its facilities constitutes gross mismanagement under § 1104(a)(1).

7. Sharon management's payment of $294 million in secured bank loans and millions of dollars to Posner while suffering huge losses and while its manufacturing facilities desperately needed repair and were allowed to deteriorate, and while incurring a $30 million working capital loan at a 28%–30% interest, and so stripping Sharon of cash that trade credit became unavailable reveals manifest self-interest and total disregard for the welfare of Sharon and the rights of its creditors which exceeds any standard necessary to show gross mismanagement and grounds for appointing a trustee under either § 1104(a)(1) or § 1104(a)(2).

8. The continuing losses averaging some $2 million per month postpetition,

even while operating under the protective umbrella of the Bankruptcy Court, are causing further harm to creditors and other parties in interest and reveal that Sharon management cannot achieve the goal of reorganization, and constitute incompetence and gross mismanagement and cause for appointing a trustee under § 1104(a)(1) or § 1104(a)(2).

9. The ongoing problem of fair allocation of costs of the Miami offices among Sharon and other Posner-owned businesses is exacerbated by the conflicts in interest, and only an independent trustee can make a proper investigation and determination of the best interests of Sharon. The appointment of a trustee is in the interest of creditors, non-controlling equity security holders, and other interests of the estate, under § 1104(a)(2).

10. No facts were shown after January 11, 1988 which were not considered prior thereto, which could form a basis for vacating the January 11, 1988 order directing the appointment of a trustee.

11. Victor Posner's huge withdrawals from Sharon at a time of financial crisis, his refusal to be deposed, and his erratic conduct before the court, constitute gross mismanagement, incompetence in terms of managing and directing the course of Sharon in these reorganization proceedings, and constitute a basis for the appointment of a trustee under § 1104(a)(1) or § 1104(a)(2).

12. Consideration of all of the facts of this case as a whole requires the conclusion that it is in the best interest of creditors, non-controlling equity security holders and other interests of the estate that a trustee be appointed under § 1104(a)(1).

13. In a case of this magnitude, the cost of having a trustee in place is insignificant when compared with the other costs of administration and when compared with the enormous benefit to be achieved by the establishment of trust and confidence in Sharon's management.

## VI. Conclusion

The foregoing is intended to accompany this court's order of January 11, 1988, directing the U.S. Trustee to appoint a reor-ganization trustee, our approval of the appointment of James W. Toren on January 15, 1988, and our refusal of motions to reconsider.