IT IS ORDERED that Arie Enterprises, Inc.'s Motion to Allocate Tax Payments is DENIED.[5]

**In the Matter of the PMH CORPORATION, Debtor.**

**Bankruptcy No. 88–31334–RKR.**

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

June 8, 1989.

Fred R. Hains, South Bend, Ind., for debtor.

Mark J. Phillipoff, South Bend, Ind., for Adami–Saenger Partnership Number I.

John W. Van Laere, South Bend, Ind., for Elfriede Ruppert.

Nancy Hockman, South Bend, Ind., for U.S. Trustee.

## ORDER

ROBERT K. RODIBAUGH, Senior Bankruptcy Judge.

On July 26, 1988, The PMH Corporation ("PMH"), the debtor herein, filed its Motion for Approval of Compensation of Debtor's Officer requesting the court to permit the debtor to hire Peter M. Helmschrott ("Helmschrott") at the rate of $5,000.00 per month. On August 3, 1988, Elfriede Ruppert ("Ruppert") filed his Objection to the debtor's motion asserting that the amount of $5,000.00 per month is excessive for the services performed by Helmschrott. On

---

**5.** The debtor may renew its motion at the appro-  priate time regarding any future payment.

August 17, 1988, Adami–Saenger Partnership Number I ("Adami") filed its Objection also submitting that the requested salary for Helmschrott is excessive and asking the court to deny the debtor's motion. On November 3, 1988, Adami filed its Motion for Appointment of Trustee (1104(a)). Thereafter, on February 1, 1989, Adami filed its Emergency Verified Motion to Lift Stay. The court held a hearing on the parties' motions on February 27, 1989, at which time it reconsidered the amount of the interim adequate protection rental payments ordered to be paid by PMH. The court took the matters under advisement on February 28, 1989.

## Background

PMH filed its petition under Chapter 11 of the Bankruptcy Code on July 26, 1988. PMH's sole asset is Tivoli's Videothek ("Tivoli's") which it leased from Helmschrott Management Company, Inc.,[1] for a period of fifteen (15) years with a ten (10) year renewal option pursuant to a lease agreement (Lease) dated December 1, 1984. The Lease does not require PMH to make any rental payments during the entire term but indicates that the debtor's substantial investment in Tivoli's is the consideration for the rental abatement during the term of the Lease. The Lease is signed by Helmschrott, as president for PMH *and* as president for Helmschrott Management Company, Inc. Notably, Helmschrott Management Company, Inc., is not the owner of Tivoli's but also is a lessee of the property. Helmschrott Management Company, Inc., is a party to another lease ("Master Lease") with Adami, the owner of Tivoli's and the North Village Mall. The Master Lease authorized Helmschrott Management Company, Inc., to sublet the stores and other premises of the North Village Mall and surrounding property to interested tenants.

In 1988 Adami initiated an action in the St. Joseph Circuit Court asserting its right to possession of Tivoli's. On July 26, 1988, the Honorable Terry A. Crone, then Judge Pro Tem of the St. Joseph Circuit Court, issued a prejudgment order of possession of real property in favor of Adami following a three-day hearing on the matter conducted by the Honorable John W. Montgomery. A few hours later PMH filed its Chapter 11 petition in this court. On August 1, 1988, following a hearing on Adami's Verified Motion to Allow Retaking of Premises Alternatively For Abandonment and Lifting of Automatic Stay, this court issued its Order lifting the automatic stay to allow the St. Joseph Circuit Court to resolve the action pending before it. The court further ordered that the automatic stay would remain in effect as to PMH's possession of Tivoli's until further order of the court and that PMH was required to pay a fair rental fee in the amount of $10,000.00 per month to Adami for its adequate protection, beginning on August 26, 1988. The court agreed in the August 1, 1988, Order to reconsider the amount of the interim adequate protection rental payments at the hearing on PMH's Motion for Approval of Compensation of Debtor's Officer which was held on February 27, 1989.

## Discussion and Decision

### 1. Appointment of a Trustee

In the usual situation Chapter 11 of the Bankruptcy Code permits a debtor in possession to continue managing its business operations. This policy is based upon the fact that "very often the creditors will be benefited by continuation of the debtor in possession, both because the expense of a trustee will not be required, and the debtor, who is familiar with his business, will be better able to operate it during the reorganization case." H.R. No. 95–595, 95th Cong., 2d Sess., *reprinted* in 1978 U.S.Code & Admin.News 5787, 5963, 6192. Courts thus have been reluctant to appoint a trustee until a debtor has had a reasonable opportunity to seek confirmation of a plan of reorganization and make a fresh start as Congress intended. This court always has been very concerned with a creditor or creditors that may attempt to litigate the debtor to death and hence frustrate a possible reorganization. Moreover, the court always is mindful that a trustee will

1. Helmschrott apparently owns and operates    Helmschrott Management Company, Inc.

cause additional expense, which in and of itself may chill a plan of reorganization. Nevertheless, in certain circumstances the court recognizes that appointing a trustee is necessary. Adami asks the court to determine whether a trustee should be appointed in this case.

■ Title 11 U.S.C. § 1104(a) sets forth the standard for appointment of a trustee:

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a) (Callaghan 1988). The party seeking the appointment of a trustee in a Chapter 11 case bears that burden of showing by clear and convincing evidence that the appointment is necessary. *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr.W.D.Pa.1988), quoting *In re Parker Grande Development, Inc.*, 64 B.R. 557 [, 561] (Bankr.S.D.Ind.1986) (citing *In re General Oil Distributors, Inc.*, 42 B.R. 402 [, 408] (Bankr.E.D.N.Y.1984)).

If insufficient cause exists to appoint a trustee under § 1104(a)(1), or if the movant is unable to prove cause exists, the court still may appoint a trustee pursuant to § 1104(a)(2) if the appointment is in the best interests of the creditors, certain equity security holders, or the estate. 86 B.R. at 458. The court therefore is not restricted to the enumerated causes in § 1104(a)(1) in appointing a trustee. *Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) (citing *In re William H. Vaughn & Co., Inc.*, 40 B.R. 524 [, 526] (Bankr.E.D. Pa.1984)). *See also* 86 B.R. at 458 (citing *In re Brown*, 31 B.R. 583 (D.Col.1983); *In re Denrose Diamond*, 49 B.R. 754 (Bankr. S.D.N.Y.1985); *In re Ford*, 36 B.R. 501 (Bankr.W.D.Ky.1983); and *In re Main Line Motors, Inc.*, 9 B.R. 782 (Bankr.E.D. Pa.1981)).

In appointing a trustee a court must carefully examine a debtor's past and present conduct to determine "the overall management of the debtor corporation; the experience, skills and competence of the debtor-in-possession both past and present, and the trust and confidence in the debtor-in-possession by members of the business community with whom debtor-in-possession has had business transactions and must, of necessity, continue to have the same." 86 B.R. at 458. A court also may look to many factors including, but not limited to, the debtor's history of transactions with companies affiliated with the debtor,[2] the debtor's failure to keep adequate records and to make prompt reports,[3] the debtor's principal's actions in withdrawing substantial sums of money from the debtor and placing the funds in a related non-debtor business,[4] as well as acts of the debtor which are "in wanton and reckless disregard of the financial reality of the business and its creditors."[5] In essence, the courts rely on the pertinent facts which, when viewed in the context of the particular case, indicate that a trustee is needed. 86 B.R. at 458 (citing *In re McCorhill Pub, Inc.*, 73 B.R. 1013 (Bankr.S.D.N.Y.1987); *In re Evans*, 48 B.R. 46 (Bankr.W.D.Tex. 1985); *In re William H. Vaughn & Co.*, 40

---

**2.** 838 F.2d at 1136.

**3.** *Id.*

**4.** 86 B.R. at 458 (citing *In re Main Line Motors, Inc.*, 9 B.R. 782 (Bankr.E.D.Pa.1981)).

**5.** *Id.* (quoting *In re La Sherene, Inc.*, 3 B.R. 169, 175–76 (Bankr.N.D.Ga.1980)).

B.R. 524 (Bankr.E.D.Pa.1984); *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174 (Bankr.E.D.Pa.1984); and *In re L.S. Good & Co.*, 8 B.R. 312 (Bankr.N.D.W. Va.1980)).

Reviewing the circumstances of this case as well as the evidence presented by the parties herein, the court concludes that the appointment of a trustee is necessary. Initially, the court finds that PMH has failed to fulfill many of the requirements of the Order Appointing Debtor In Possession entered on July 28, 1988, shortly after the filing of this case. The July 28, 1988, order appointed PMH as a debtor in possession and authorized it to continue to operate in the ordinary course of business and to manage its property until further order of the court. The order directed PMH to file its proposed plan and disclosure statement within 120 days (by November 23, 1988) or, if the debtor was unable to file its plan and disclosure statement by that date, to file a verified report listing the financial condition of the debtor, summarizing the operations and obligations of the debtor, listing the names and addresses of parties entitled to administrative expenses, and summarizing the debtor's efforts to form a plan of reorganization, the anticipated plan filing date and the reasons why it has not yet filed a plan and disclosure statement.

The order further specifically stated that the debtor in possession:

1. Shall not pay any debt or obligation incurred prior to the filing of the petition for relief unless payment of the prepetition debt is specifically authorized by the Court.

. . . .

3. May employ, discharge and fix the compensation, salaries and wages for all managers, agents, employees and servants of the debtor, as it deems necessary and advisable for the proper operation of the business and the management, preservation and protection of the property of the estate. However, the compensation of all "insiders," as defined by § 101(28) [sic] of the Code, must be approved by the Court prior to payment

. . . .

5. May not sell, lease or otherwise dispose of property not in the ordinary course of business or enter into any transaction not in the ordinary course of business except pursuant to court order.

6. Shall close the books of account and records of the debtor as of the day preceding the filing of the petition for relief, and shall open new books of account and records for the Debtor in Possession showing all earnings, expenses, receipts and disbursements commencing with the date of the filing of the petition for relief.

7. Shall close all bank accounts maintained prior to the filing of the petition for relief, and all funds on deposit to the credit of the debtor in said accounts shall be transferred to new accounts to be opened by the Debtor in Possession.... All monies received after the date of the filing of this case shall be deposited only into the debtor in possession account. All payments made after the date of the filing of this case shall be made only out of the debtor in possession account.... All bank accounts shall bear the notation "debtor in possession" as part of the account title and on all new bank prenumbered checks....

. . . .

13. Shall prepare and file with the Court ... a verified monthly report of the operations of the business ... within fifteen (15) days of the end of the month being reported.... The report of operations will contain, at a minimum: a detailed cash flow report; a statement of the inventory on hand at the beginning and end of the month; a detailed statement of the type and amount of all tax payments and deposits made during the month; and a detailed statement of all debts incurred and remaining unpaid since the filing of the petition for relief.... It is the duty of the attorney for the Debtor in Possession to be sure the debtor properly and accurately completes the report....

Order Appoint Debtor in Possession (July 28, 1988).

■ The court finds upon examining the docket in this case that PMH failed to file its proposed plan and disclosure statement by November 23, 1988, as ordered by the court and also failed to file a verified report summarizing the operations and obligations of PMH and explaining why it has failed to file a proposed plan of reorganization. In fact, on April 3, 1989, the court entered its Order directing PMH to submit its disclosure statement and plan or show cause in writing why the court should not dismiss or convert the case. In response to the court's Order PMH filed a one-half page statement on April 28, 1989, indicating that it has been unable to formulate a plan and disclosure statement due to the continuing problems it is experiencing with its landlord, Adami, regarding its rental of Tivoli's and due to the trial scheduled to begin in the St. Joseph Circuit Court on May 30, 1989, regarding PMH's right to possess Tivoli's. While the court agrees that these difficulties may have complicated PMH's efforts to file a plan and disclosure statement, the court does not believe that these problems justify PMH's noncompliance with the court's order. PMH had from July, 1988 to November 23, 1988, to submit this information to the court, yet failed to do so until after the court threatened to dismiss the case for failure to comply with the court's Order. Even PMH's filed response is insufficient to comply with the terms of the July 28, 1988, Order.

In addition, PMH's operating reports indicate that in the month of August, 1988, PMH paid $10,000.00 on a pre-petition debt to Helmschrott Management Company, Inc., and paid management fees of $2,179.00 in August, 1988, $3,000.00 in September, 1988, and $2,000.00 in October, 1988, to Helmschrott Management Company, Inc., for the management services of Helmschrott without court authority. At the hearing on this matter Helmschrott stated that PMH owes Helmschrott Management Company, Inc., $75,000.00 pursuant to a promissory note, owes Helmschrott personally at least $244,000.00 and may owe a corporation called Rock America, also owned by Helmschrott as much as $39,465.00. PMH and Helmschrott, however, failed to list these significant debts in PMH's schedules. The name of Helmschrott Management Company, Inc., does not appear on PMH's schedules as a creditor.

Moreover, inasmuch as Helmschrott is an "insider" of PMH pursuant to 11 U.S.C. § 101(30), the court's Order of July 28, 1988, required PMH to obtain court approval before hiring Helmschrott as manager. Helmschrott apparently has been working as manager for PMH since PMH filed its petition, although the court has not yet approved his employment or that of Helmschrott Management Company, Inc. Acting as manager of PMH, Helmschrott authorized the removal and storage of various large items of equipment from Tivoli's between February 6 and 7, 1989, including a 150–square foot walk-in cooler, several large compressors from the roof of Tivoli's, several ovens and free-standing fryers. Removal of these items required the use of large trucks and vans as well as a crane to extricate the compressors from the roof of Tivoli's. At the hearing on this matter Helmschrott could not tell why he had authorized the removal of these items without court approval other than stating that Tivoli's currently is not using them and that he thought the compressors might freeze up if they were not being used. Helmschrott admitted that he had no reason to rush to remove the equipment and that PMH has not paid for the removal of the items. He also stated that he has no idea what the cost of removing the items might be. Helmschrott asserts that Atlas Equipment has agreed to store the items at no charge until PMH is able to sell the equipment with court approval. The court finds it difficult to believe that a debtor in possession who is unable to make rental payments as ordered by the court and who is in the midst of an embroiled legal controversy concerning its right to possession of a facility would undertake the considerable task of dismantling and removing major items of equipment from the premises outside the ordinary course of business without knowing what the costs of these ac-

tions might be. Certainly, these actions violated the court's Order of July 28, 1989.

Unfortunately, these actions are not the only ones the court finds which PMH and Helmschrott have taken in violation of the court's July 28, 1989, Order. Helmschrott admitted at the hearing on this matter that he has failed to sign the operating reports filed by PMH and that he is barely aware of the information which his accountants (whose employment has never been authorized by the court) have assimilated in the operating reports. For instance, Helmschrott was unable to adequately explain for what purpose PMH paid Helmschrott Management Company, Inc., $76,500.00 in the year prior to the filing of PMH's petition. Helmschrott testified that the various schedules filed on behalf of PMH included various errors and omissions but admitted he had taken no action to amend the schedules. PMH further failed to begin using checks indicating that it was a debtor in possession until November 1, 1988, over three months after filing the Chapter 11 petition. In addition, PMH has defaulted with respect to the court's Order of August 1, 1988, requiring PMH to make adequate protection rental payments to Adami in the amount of $10,000,000 per month. As of the date of the hearing PMH had failed to make the January and February, 1989, payments. The docket in this case further reveals that PMH has not filed operating reports for March or April of 1989.

Reviewing the evidence as summarized above, the court believes that it must appoint a trustee in this case to attempt to straighten out the mismanagement problems which have befuddled PMH throughout these proceedings. The court further finds that appointing a trustee is in the best interest of PMH's estate and its creditors.

### 2. Compensation of Debtor's Officer

■ In its Motion for Approval of Compensation of Debtor's Officer PMH states that it has employed Helmschrott as its President for more than three years and that his services are necessary for the operation of its business and ongoing efficient working organization. PMH asks the court to permit it to pay Helmschrott $5,000.00 per month for his services and asserts that Helmschrott's continued employment with PMH is in the best interests of the debtor. Adami and Ruppert[6] object to the debtor's motion for approval of compensation for Helmschrott asserting that $60,000.00 per year is an excessive salary for the services performed and that Helmschrott's services are duplicative of services performed by other management personnel of Tivoli's. They accordingly ask the court to deny PMH's motion.

Sorting through the evidence and testimony presented at the hearing on this matter, the court finds that Helmschrott's relationship with PMH is at best questionable at this point. The court therefore declines to authorize compensation for Helmschrott at this time. Helmschrott certainly has been unable to aid PMH in carrying out the court's Orders in this case and in fact personally has taken actions in direct violation of the court's Orders. Hence, while Helmschrott indeed may have some skills which would benefit PMH in its business operations, the court is unable to decifer exactly what services Helmschrott could provide and the value of those services at this time. The court therefore defers its decision on this matter until the trustee to be appointed herein is able to investigate PMH's business operations and hopefully bring some order out of the current chaos. At that time the court believes Helmschrott's role in PMH's operations will be more clear to the court.

### 3. Rental Issue

■ The parties herein also ask the court to reevaluate the amount of the interim adequate protection rental payments which PMH must pay Adami pursuant to the court's Order of August 1, 1988. The

---

6. Ruppert is an investor in Duff's Famous Smorgasbord, a business formerly operated by PMH and now known as Tivoli's.

court concludes based upon the testimony and evidence presented that the payments should remain at $10,000.00. At the hearing on the matter the court heard the testimony of John J. O'Brien, a real estate broker employed by Coldwell Banker Anchor Real Estate who testified that he believes the fair rental value for Tivoli's is $6.00 per square foot per year for base rent plus a sum of $1.50 per square foot per year for common area maintenance, and an additional $6.66 per square foot per year for the value of the improvements on the premises.[7] Mr. O'Brien indicated that if the tenant itself had provided the $600,000.00 worth of improvements on the premises the rental value of Tivoli's would be reduced to $7.50 per square foot per year or $10,000.00 per month ($7.50 per square foot × 16,000 square feet ÷ 12 months).

The court also heard the testimony of Patricia Annette Lee who currently manages the North Village Mall. Ms. Lee calculated the common area maintenance value for Tivoli's to be $2.38 per square foot per year rather than the figure of $1.50 per square foot per year amount used by Mr. O'Brien. Ms. Lee arrived at the $2.38 figure by multiplying the percentage of leaseable square footage in the North Village Mall used by Tivoli's times the common area maintenance expense for 1988 of approximately $175,460 and dividing that figure by the square footage of Tivoli's (21.7% × $175,460 = $38,074.82 ÷ 16,000 square feet = $2.38 per square foot per year). For 1989 Ms. Lee estimates that the common area maintenance figures for Tivoli's will be $2.44 per square foot. Using a figure of $8.00 per square foot (the average base rent for tenants of the North Village Mall), Ms. Lee places the rental obligation of Tivoli's at $13,933.00 per month.

The court concludes based upon Mr. O'Brien and Ms. Lee's testimony that Tivoli's shall be required to continue paying Adami $10,000.00 per month in adequate protection rental payments.

*Conclusion*

WHEREFORE, the court now grants Adami's motion for appointment of a trustee in this case and defers its ruling on PMH's motion for approval of compensation for Helmschrott until the trustee has had an opportunity to investigate PMH's business operations and Helmschrott's relation thereto. The court further determines that PMH shall be required to continue making monthly adequate protection rental payments to Adami in the amount of $10,000.00 per month. It is

SO ORDERED.

---

7. Mr. O'Brien based the $6.66 per square foot per year figure for improvements on a ten-year amortization of the value of improvements at 12 percent interest. He concluded that rent would need to be increased by $1.11 per square foot for each $100,000.00 of improvements in order to recover the value of the improvements within ten years. Mr. O'Brien arrived at the $6.66 per square foot per year sum for improvements using a $600,000.00 value for the improvements.