### In re MICROWAVE PRODUCTS OF AMERICA, INC., Debtor.

**Bankruptcy No. 88–27990–D(sbb).**

United States Bankruptcy Court, W.D. Tennessee, W.D.

July 21, 1989.

See also, Bkrtcy., 102 B.R. 659, and, Bkrtcy., 102 B.R. 661.

David J. Cocke, Borod & Kramer, Memphis, Tenn., Tom Garcin, Stutman, Treister & Glatt, P.C., Los Angeles, Cal., for Litton Industries.

Harris P. Quinn, Memphis, Tenn., Richard B. Gossett, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Chattanooga, Tenn., for debtor.

Everett Gibson, Memphis, Tenn., for Unsecured Creditors Committee.

Jack F. Marlow, Memphis, Tenn., for AUIC.

Henry C. Shelton, III, Memphis, Tenn., for Western Industries.

Irvin Bogatin, Memphis, Tenn., for Keystone Transformer Co.

Gary Vanasek, Asst. U.S. Atty., Memphis, Tenn.

Gordon B. Conn, Jr., Minneapolis, Minn.

John L. Ryder, Memphis, Tenn., for FIBC.

Jennie D. Latta, Memphis, Tenn., for Magnetek, Inc.

William A. Carson, II, Memphis, Tenn., for Midwest Coast Transport.

Julie C. Chinn, Asst. U.S. Trustee, Memphis, Tenn.

Alan Kolad, New York City, for Moulinex.

Brent Whittlesey, Los Angeles, Cal., for Microwave Holdings.

Thomas Anton, Bakersfield, Cal., for Hilltop Developers.

Martin, Tate, Marston & Moore, Memphis, Tenn.

## MEMORANDUM OPINION AND ORDER ON MOTION FOR APPOINTMENT OF TRUSTEE

BERNICE BOUIE DONALD, Bankruptcy Judge.

The above-styled core proceeding[1] came on for hearing on motion of the unsecured creditors' committee and Litton Industries, a secured creditor and party-in-interest, to appoint a trustee. The issue for judicial determination is whether cause exists pursuant to 11 U.S.C. § 1104(a)(1) for the appointment of a trustee, or whether under 11 U.S.C. § 1104(a)(2) it is in the best interest of creditors and the estate to appoint a trustee. The movants have alleged as

---

1. 28 U.S.C. § 157(b)(2)(A).

grounds for the appointment of a trustee the following:

1. Cause exists for the appointment of a trustee based on fraud, dishonesty, incompetence and gross mismanagement of the affairs of the debtor by current management, both before and after the commencement of the case.

2. The appointment of a trustee is in the best interest of creditors and other interests of the estate.

3. Substantial losses and mismanagement of the debtor will continue, absent the appointment of a trustee.

The following shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## CASE SUMMARY

The relevant facts as revealed by the pleadings and evidence are summarized herein. This chapter 11 case was filed by Microwave Products of America, ("MPA" or "Debtor") on October 28, 1988. The debtor's schedules reflect $59,526,363.00 in assets, and $57,470,274.00 in liabilities at the time of filing of the chapter 11 petition. Since the filing, the debtor has continued to operate the business as debtor-in-possession[2] subject to its Board of Directors, its parent corporation, Microwave Holdings, Inc. ("Holdings") and its majority directors, Wayne C. Reeder ("Reeder") and Viphin Sahgal ("Sahgal"). Approximately three (3) days after the filing of the petition, the debtor fired its president, L. Joe Scallan, and has operated without a chief executive officer for most of its history. The highest ranking corporate executive since shortly after the filing of the petition has been and remains Gary Pearson, Vice President for the debtor.[3]

The debtor's principal business is developing, constructing, and selling microwave ovens, both consumer and commercial. The debtor has offices in Memphis, Tennes-

see and Sioux Falls, South Dakota. The assets of the debtor were purchased from Litton Systems for approximately $34 million dollars, less adjustments, on August 16, 1988. After the company was formed, Reeder and Sahgal were named officers and directors of Holdings, and consequently controlled both Holdings and the debtor, as a subsidiary.

Reeder controlled fifty-two percent (52%) of the voting shares of Holdings through a trust in favor of his children and Sahgal controlled forty-four percent (44%) of the voting shares of Holdings through members of his family and VHS Holdings, Inc.

Litton sold the assets of its Microwave Cooking Products Division to Holdings pursuant to a Purchase and Sale Agreement dated July 1, 1988, as amended ("Agreement"). Pursuant to the Agreement, Holdings had an option to nominate a subsidiary which would take title to a portion of the assets to be transferred under the Purchase and Sale Agreement, while at the same time the subsidiary would assume a portion of the liabilities and concurrent obligations.[4] Holdings nominated Microwave Products of America, Inc. ("Products" or "Debtor") to receive all the business and assets of Litton Systems, Inc.'s Microwave Cooking Products Division, which constituted all of the American operations. The sale was closed on August 16, 1988. However, the transfer date was July 29, 1988.

The consideration paid by the debtor included $10 million dollars cash, and $19 million dollars in promissory notes, $15 million dollars of which was due on October 27, 1988, and secured by a surety bond issued by American Universal Insurance Company ("AUIC") of Providence, Rhode Island. The $15 million note is now in default. Litton has made demand upon AUIC for payment of the $15 million dollars under the provisions of the indemnity bond.

---

2. 11 U.S.C. §§ 1107(a) and 1108.

3. Gary Pearson's titles during the history of the debtor have been "Executive Vice President", "Vice President", and "Chief Financial Officer".

4. Trial Exhibit No. 17, Purchase and Sale Agreement among Litton Industries, Inc., Litton Systems, Inc., Litton Canada, Inc., Litton U.K., Limited, and Microwave Products, Inc., dated July 1, 1988.

Reeder is the owner of sixty percent (60%) of the voting shares of Resolute Holdings, Inc., a corporation which wholly owns AUIC.[5]

In addition to the proceeds of the loan from FIBC, the debtor's initial capitalization consisted largely of a note in the amount of $5 million made by Hilltop Developers, Inc., ("Hilltop") a company wholly owned by Reeder, payable to Reeder. Reeder then assigned the note to Holdings, and Holdings reassigned it to the Debtor. Subsequently, the directors of the debtor allegedly sold the note back to Hilltop for $3.3 million dollars, a substantial discount[6] at a time when the debtor was experiencing a severe cash shortfall. However, this repurchasing transaction was not reflected on the books and records of the debtor. In fact, the debtor's books still show a note receivable from Hilltop in the amount of $5 million. The debtor and Holdings differ with respect to the treatment of this note, but the debtor has failed or refused to pursue any potential claims that it might have under the Hilltop note or against Holdings or the shareholders who supposedly sold the note at a substantial discount.[7]

Pursuant to the Agreement, Holdings obtained the right to purchase all of Litton's microwave assets. Holdings also had the right to nominate a subsidiary to receive a portion of the assets and assume a portion of the debts. The debtor was named as nominee to receive only the assets located in the United States; however, the debtor assumed full responsibility for the entire purchase price, including the Canadian and United Kingdom assets. Holdings purportedly received the U.K. and Canadian assets.[8] Some conflict exists with regard to the characterization of this transaction.

Schedules and operating reports filed by the debtor show a receivable from Holdings in the approximate amount of $1.2 million to cover the value of the foreign assets retained by Holdings. Holdings apparently denies any liability for the assets it retained. The debtor has failed and has refused to proceed against Holdings to recover Holdings' obligations to the debtor relating to the transfer of the foreign assets.

At the time of the closing, First Interstate Bank was to receive a security interest in all of the accounts receivable that existed as of the transfer date, including those of the foreign subsidiaries. Holdings has apparently been making collections on accounts receivable held by Canada and U.K., and has not been remitting them to First Interstate Bank. It is uncertain whether some or all of the funds may have been paid to the debtor.

The foreign subsidiaries are essentially distribution centers which purchase ovens from the American manufacturing entity, the debtor, and sells them abroad through the subsidiaries owned by Holdings. The foreign subsidiaries have no production capabilities of their own and are completely dependent on the debtor for inventory. Holdings has caused the debtor to give Holdings substantial credit, and there now exists outstanding accounts receivable balances in excess of $1 million. This amount allegedly exceeds the amount of receivables that existed as of the date of the filing of the petition.

Sahgal, a director of the debtor, is the principal of Vista Group Limited ("Vista"). Vista was the entity which negotiated and structured the purchase transaction with Litton. Because of several transactions,

---

5. The parties allege that Reeder's ability to act in a fiduciary capacity to the debtor is adversely affected by his interest in AUIC, and AUIC's liability under the indemnity bond.

6. See trial exhibit No. 14. Further, the creditors' committee and Litton contend that the $3.3 million dollars was a cash infusion to meet a financial crisis, and was not a repurchase of the note. See trial transcripts, pp 706–709, May 5, 1989.

7. The unsecured creditors' committee argues that Reeder's substantial interest in Hilltop and his involvement in the alleged discounting of the note impairs his ability to act in a fiduciary matter regarding the debtor-corporation and its creditors.

8. The Canadian and United Kingdom operations are being operated at a profit, but none of those proceeds are being passed to the debtor, MPA.

the movants allege that substantial sums were paid to Sahgal and/or Vista which may be subject to avoidance as fraudulent conveyances or as preferences. In addition, Sahgal has been unable to account for approximately $700,000.00 of the proceeds from the First Interstate Bank loan.[9]

MHI filed a plan and disclosure statement, which disclosure statement was not approved by this court.

## BURDEN OF PROOF

■ On a motion for the appointment of a trustee, the court must conduct a full evidentiary hearing. *In re Casco Bay Lines, Inc.,* 17 B.R. 946 (BAP 1st Cir.1982). The moving party, the party requesting the appointment of a trustee, has the burden of proof. *In re William A. Smith Construction Co., Inc.,* 77 B.R. 124 (Bankr.N.D.Ohio 1987). The evidence to support the motion must be clear and convincing. *In re St. Louis Globe–Democrat, Inc.,* 63 B.R. 131 (Bankr.E.D.Mo.1985); See also, *In re Evans,* 48 B.R. 46 (Bankr.W.D.Tex.1985).

## DISCUSSION

11 U.S.C. § 1104 provides in pertinent part:

### § 1104. Appointment of trustee or examiner.

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

■ The appointment of a trustee is the exception rather than the rule in chapter 11 cases, and is an extraordinary remedy available to creditors.[10] Inasmuch as chapter 11 is designed to give the debtor an opportunity to rehabilitate through reorganization, the Bankruptcy Code favors allowing the debtor to remain in possession and operate the business. *In re Clinton Centrifuge, Inc.,* 85 B.R. 980 (Bankr.E.D. Pa.1988), *In re Allsun Juices, Inc.,* 34 B.R. 162 (Bankr.M.D.Fla.1983). In chapter 11, a debtor should remain in possession unless a party-in-interest can prove that the appointment of a trustee is warranted. *In re BAJ Corp.,* 42 B.R. 595 (Bankr.D.Conn.1984); *In re General Oil Distributors, Inc.,* 42 B.R. 402 (Bankr.E.D.N.Y.1984); *In re La Sherene, Inc.,* 3 B.R. 169 (Bankr.N.D.Ga. 1980).

As debtor-in-possession, the debtor represents the estate, and has a fiduciary duty to exercise business judgment for the benefit of the estate. Therefore, the general rule is that absent fraud, dishonesty, or gross mismanagement, the debtor should be left in possession, and given an opportunity to propose a plan of reorganization. 5 Collier on Bankruptcy ¶ 1104.01 (15th ed. 1979). As representative of the estate, and wearing the shoes of a reorganization trustee, the debtor is given some latitude to make decisions for the benefit of parties with differing interests.

While the Code and case law favors allowing the debtor to remain in control, and run the business, under certain circumstances the debtor may be dispossessed, and other management appointed in the form of a trustee. Clearly the Code provides two separate and distinct standards

---

9. During the trial, Sahgal accounted for much of the $700,000, but approximately $200,000 remained unaccounted for. Since much of those amounts went to Sahgal via the "Vista" group, or Reeder, through his companies, questions of conflict of interest or avoidable transfers are raised.

10. *In re Hotel Associates, Inc.,* 3 B.R. 343, 345 (Bankr.E.D.Pa.1980).

for the court to evaluate the necessity for the appointment of a trustee. 11 U.S.C. § 1104.

■ Section 1104(a)(1) provides for a showing of cause, the court shall order the appointment of a trustee. Cause may be based on "fraud, dishonesty, incompetence, or gross mismanagement" of the debtor. However, this list found in Section 1104(a)(1) is not exhaustive as, "includes" is not limiting.[11] The court may consider both prepetition, as well as postpetition conduct in determining the necessity of a trustee. *Midlantic National Bank v. Anchorage Boat Sales, Inc.*, (*In re Anchorage Boat Sales, Inc.*), 4 B.R. 635, 644–45 (Bankr.E.D.N.Y.1980), *quoted in In re H & S Transport Co.*, 55 B.R. 786, 790 (Bankr. M.D.Tenn.1982).

■ However, the fact that prior management of the debtor is guilty of fraud, dishonesty, incompetence, or gross mismanagement does not necessarily provide grounds for the appointment of a trustee under section 1104(a)(1), as long as the court is satisfied that current management is free from the taint of prior management. 5 Collier on Bankruptcy ¶ 1104.01 (15th ed. 1979).

Subsection (a)(2) of § 1104 sets forth a "best interest" test wherein the court makes a determination based on what is in the best interest of creditors, equity security holders, and other interests of the estate. 11 U.S.C. § 1104(a)(2).

In the instant case, there are several factual concerns that must be analyzed in ascertaining whether this case dictates the necessity of appointing a trustee.

## BREACH OF FIDUCIARY DUTY AND SELF DEALING

As previously noted, a trustee in bankruptcy is the "representative of the estate". In a chapter 11 case, the debtor-in-possession ("DIP") has all the rights and powers, and shall perform all the functions and duties of a trustee.[12] 11 U.S.C. § 1107. The duties of a DIP include the duty to protect and to conserve property in his possession for the benefit of creditors. See, e.g., *In re Sharon Steel Corp.*, 86 B.R. 455 (Bankr.W.D.Pa.1988).

■ One of the most important functions of the DIP is to operate the business. The DIP also preserves the continuity of management and business expertise that may be important for effective business operations and reorganization. 6 Bankr. Dev.J., 24 (1989). The debtor, as representative of the estate, occupies a trust relationship subject to fiduciary obligations which include a prohibition against self-dealing. *In re Van Brunt*, 46 B.R. 29 (Bankr.W.D.Wisc.1984). Because a debtor-in-possession stands in a fiduciary relationship with its creditors, its fiduciary obligation includes refraining from acting in a manner which could damage the estate, or hinder a successful reorganization of the business. *In re Thurmond*, 41 B.R. 464 (Bankr.D.Or.1983). Generally, the trustee's fiduciary obligations are enforceable by or on behalf of the beneficiaries of the estate acting as a group. *Id.* Yet, clearly fiduciaries must be able to exercise business discretion within the Code that may result in a benefit to some claimants and not others.

For example, a trustee has the power to, among other things, propose reorganization plans differentiating among classes of creditors, to reject or assume executory contracts, to object to claims, and to decide whether to seek avoidance of some preexisting transfers and obligations. 6 Bankr. Dev.J., *supra*. Because the DIP's fiduciary obligation is to the estate, and not to one group, the DIP must act to benefit the estate as a whole.

The Supreme Court held in *Commodity Futures Trading Commission*, infra: "If a debtor remains in possession, the debtor's directors have essentially the same fiduciary obligations to creditors and sharehold-

---

**11.** 11 U.S.C. § 102(3).

**12.** Section 1101 of the Bankruptcy Code defines debtor-in-possession as debtor unless a trustee has been appointed. See also Bankruptcy Rule 9001(10).

ers as would the trustee for a debtor out of possession. The willingness to leave debtors in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibility of a trustee". *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985) quoting *Waff v. Weinstein*, 372 U.S. 633, 651, 83 S.Ct. 969, 980, 10 L.Ed.2d 33 (1963).

To assess any breach of fiduciary duty, the court must resolve the queries posed by Justice Frankfurter. "To whom is he a fiduciary? In what respects has he failed to discharge those obligations? What are the consequences of deviating from that duty?" *Securities and Exchange Comm'n. v. Chenery Corp.*, 318 U.S. 80, 85, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943).

In the instant case, the debtor as a representative of the estate is a fiduciary to the entire creditor body, the equity shareholders, and the management, officers, and directors of the debtor. While this may lead to some degree of conflict, the debtor must attempt to reasonably and honestly resolve that conflict to the best interest of the estate, and must always act in good faith. *In re Johns Manville Corp.*, 52 B.R. 879 (Bankr.S.D.N.Y.1985), remanded, 801 F.2d 60 (2d Cir.1986). In the business environment, a fiduciary is held to something stricter than the morals of the market place. *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

The notion of fiduciary obligations proscribe self-dealing and negligent behavior. These obligations are summarized as a duty of loyalty and care. The duty of loyalty and good faith forbids directors and other business operators from using their position of trust and control over the rights of other parties to further their own private interest, either by usurping opportunities, holding undisclosed conflicts, or otherwise exploiting their position. 6 Bankr. Dev.J., *supra*, p. 10 at 35.

Therefore, in the instant case, any attempt by the individual board members to structure deals that would benefit them privately to the detriment of other creditors would contravene the fiduciary relationship. Clearly, these actions could reek devastation to unsecured creditors.[13]

A trustee may be appointed for misconduct or self-dealing, such as questionable business dealings between a debtor corporation, and related entities. *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir.1988); *In re McCorhill Publishing, Inc.*, 73 B.R. 1013, 1017 (Bankr.S.D.N.Y.1982). However, the mere fact that a corporate debtor engages in a business relationship with a subsidiary or a related company does not automatically create a conflict of interest. *In re Clinton Centrifuge*, 85 B.R. at 980.

In *In re Main Line Motors, Inc.*, 9 B.R. 782, 784 (Bankr.E.D.Pa.1981), the court found sufficient cause under § 1104(a)(1) to appoint a trustee, where the president and sole shareholders of the debtor had withdrawn substantial sums from the debtor's operation, and placed them in control of two non-debtor affiliates over which the owner had control. Further, while postpetition misconduct violates fiduciary duties, excessive improper misconduct, either prepetition or postpetition, may indicate that the DIP will be an unreliable representative of the estate. 5 Collier on Bankruptcy, ¶ 1104.01 (15th ed. 1979). Creditors have substantial interests at stake which must be counterbalanced against the benefits of retaining current management. 6 Bankr.Dev.J. *supra*, p. 10 at 59.

■ Where a conflict among the parties threatens the viability of the business or serious loss to the estate, the appointment of an independent trustee is appropriate. *In re Sharon Steel Corp.*, 86 B.R. at 460.

A determination must be made that a trustee will accomplish the goals of the chapter 11 plan more efficiently and effectively than present management. This

---

**13.** Director Reeder admitted during testimony that in dealings with Moulinex, he sought to come out "whole", even though the Moulinex plan proposed to pay unsecured creditors eighty-five cents on the dollar.

mandates a critical assessment of the overall management of the debtor corporation; the experience, skills and competence of the debtor-in-possession, both past and present, and the trust and confidence in the debtor-in-possession by members of the business community with whom the debtor-in-possession has had business transactions and must, of necessity, continue to have the same. *In re Sharon Steel,* 86 B.R. at 457.

Certain actions of the debtor's board have resulted in a serious erosion of trust and confidence by creditors of MPA. Reeder, Chairman of the Board of Directors of the debtor, through a company owned 100% by himself, caused to be created a note, "Hilltop Note", in the sum of $5 million dollars, in favor of himself. Reeder, as payee, assigned the note to Holdings in exchange for all of the preferred stock of Holdings.[14] Subsequently, Holdings assigned the note to Products, in exchange for all of the Products stock, thereby making Products a wholly owned subsidiary of Holdings. The note had an interest rate of 10% per annum payable monthly, with the principal balance due in 1994. In this leveraged buyout transaction, Reeder admittedly did not anticipate the necessity for a cash contribution. Within a few days of closing, Products experienced a severe cash shortfall. Reeder then, around September 10, 1988, caused Hilltop to advance $3.3 million dollars to meet the debtor's cash requirements via a loan from First Mercantile Bank of Kansas City. According to the debtor's chief financial officer, Gary Pearson, he was never told how to reflect the transaction on the debtor's books, even though he sought directions from the board, and specifically from Reeder.

Sometime after the filing of the chapter 11 petition, Reeder proclaimed that the $3.3 million dollars was not a loan or an advance to Products, but rather a purchase of the Hilltop note at a discount. The note reflects, on its face, the notation "paid", and

is dated August 25, 1988.[15] However, at all times, subsequent to that date, and in financial documents generated by the debtor for purposes of obtaining permanent financing, the note continued to be reflected on the debtor's books as an asset with a value of $5 million dollars. The court notes with interest, that the proceeds to repurchase the note were not procured and transmitted until early September, 1988.[16] The witnesses have been unable to satisfactorily resolve this inconsistency. The CEO of MPA testified that he never saw the note until March or April of 1989. Subsequently, Reeder acknowledged that he did not tell Pearson about the discounting immediately, but did inform him within 30 days of the transaction, even though the funds were wired to Products earlier.

Serious questions have been raised and unresolved regarding whether a discounting of the note took place, and whether the transfer may be brought back into the estate of the debtor. The court will leave questions of avoidable transfers to another day, as it is not properly before the court. However, the debtor seeks absolution by saying that the positions of both the debtor and Reeder are consistent with the positions that they have taken all along. Even so, this does not eliminate the irreconcilable conflict of obligations from Holdings to the debtor, and questionable transfers. Even the debtor acknowledges that this is an issue.

While the debtor counters by contending that there was fraud on the part of the seller in the initial transaction, the court will leave that issue to another forum, since it is not properly before this court.

### FAILURE TO PROSECUTE INSIDER CLAIMS

The debtor, through Pearson, testified that there are possible causes of action that the debtor may have against the parent company which are not being pursued. There is no ongoing dialogue about those

---

14. Trial Transcript, pp. 655–657, May 5, 1989.

15. Transcript of the testimony of Viphin Sahgal, p. 473, 474, May 4, 1989.

16. Transcript of testimony of Gary Pearson, pp. 66–69, January 24, 1989.

potential actions. However, the debtor maintains that all actions are preserved.[17] There is substantial interrelatedness between the debtor's parent company and certain affiliates, and many transactions between them have been consummated. One such transaction surrounds the initial purchase of the debtor from Litton Industries. At the time of the purchase, MPA was nominated to hold the U.S. assets, while Holdings would receive the U.K. and Canada assets. However, all acquisition costs were allocated to MPA. The Holdings assets are shown on the debtor's books as a receivable in the amount of $1.478 million dollars. Yet, the debtor has made no attempts to collect those receivables. This poses potential detriment to the estate. The debtor correctly states, "The fact that a corporation engages in business with subsidiaries or related corporations does not dejure establish a conflict of interest". *In re F.A. Potts & Co., Inc.*, 20 B.R. 3 (E.D.Penn.1981), *quoting In re Bel Air Associates, Ltd.*, 4 B.R. 168 (Bankr.W.D. Okla.1980). However, the court in *Potts* also suggested that the confidence of the secured creditors in the debtor's ability to operate the company, might have a bearing on whether to appoint a trustee. There the court found that there has been no testimony from the secured creditors expressing skepticism about the debtor's ability to maintain its operations. *In re F.A. Potts*, 20 B.R. at 5. To the contrary, the creditors in this case have expressed serious loss of confidence in the debtor's ability to effectively operate the business because of interference from the Board of Directors. While the testimony at trial was that there had been no actual interference from the Board of Directors, the history of revolving door management, and the failure to pursue possible causes of action that would benefit the estate, supports the creditors' concerns.

The debtor contends, inter alia, that the use of cash collateral by consent is the quid pro quo for not taking immediate action against the parent for any possible claims. The court finds this reasoning untenable, since, as a fiduciary of the estate, the debtor must act for the benefit of the estate and all creditors. If there are causes to be pursued that would benefit the estate, the debtor may not justifiably forego those as a bargaining tool to obtain consent to use cash collateral, especially in light of the fact that the Code provides a clear and adequate remedy under 11 U.S.C. § 363.

In a liquidation analysis produced during the hearing, the total liquidation value of the debtor is estimated at $26,445 million dollars, $4.78 million dollars of which is related to collecting the receivables from Holdings and the Hilltop note.[18] The debtor is currently not pursuing any of these actions, which if successful, would inure to the benefit of the estate.

### GROSS MISMANAGEMENT AND INCOMPETENCE

In the instant case, the debtor has had revolving door management since the acquisition on August 16, 1988. The directors of the debtor retained L. Joe Scallan as CEO, but abruptly removed him a few days after the filing of the petition. Allegedly, Scallan was removed because he demanded an exorbitant salary. Wherein, director Sahgal became CEO and managing director of corporation. Sahgal testified that he resigned on April 23, 1989, because of personal difficulties, having served less than six (6) months. All parties, including Reeder, Chairman of Board, secured and unsecured creditors, agreed that the debtor needed stronger operations management in order to be effective. A management group, The Belet Group, was brought in pursuant to a consent order of the parties May 23, 1989, following the hearing on the motion to appoint a trustee. The only continuity in management of the company has been, Gary Pearson, who served as vice president, and chief financial officer of the

---

**17.** Statement of Richard Gossett, Attorney for Debtor, contained in written closing argument filed with the court June 5, 1989.

**18.** Trial Exhibit No. 7 at page 18.

debtor.[19]  Clearly, Pearson served at the pleasure of the board, although an order has been entered providing that his title, duties and responsibilities would not be altered without notice to the parties.  On its face, this appears to provide some modicum of protection, however, the degree of protection is tentative at best.  While all parties praised Mr. Pearson's abilities in his field, most admitted that he lacked the necessary skills to manage the debtor from an operations standpoint.

The debtor agrees that they have suffered from lack of strong operations management.  However, the debtor contends that the installation of The Belet Group overcomes any management deficiency.  The debtor further states that the debtor is actively implementing the recommendations made by consultants, Arthur Young & Company.  While the court finds this laudable, it is less than persuasive because the debtor, through its directors, may easily terminate the management contract, and continue the erratic management tactics that pepper the debtor's brief history.

Since the company only operated approximately 2½ months prior to filing a petition in bankruptcy, it may reasonably be assumed that the debtor did not have time to form a strong general business reputation in the community or install management on which people could rely.  This can be supported by the debtor's assertion that use of the name "Litton" beyond July 29, 1989, is critical to its reorganization.

Section 1104(a)(2) may be used to justify the appointment of a trustee when current management has been recently appointed, is competent and honest, but does not have the expertise that an exceptional trustee would have in reorganizing the debtor.  5 Collier on Bankruptcy ¶ 1104.01 (15th ed. 1979).  Yet, just as not every conflict of interest justifies the appointment of a trustee, nor does the availability of superior management alone, justify the appointment of a trustee.  In re Allsun Juices, 34 B.R. 162 (Bankr.M.D.Fla.1983).

The debtor contends that a trustee is not warranted under the reasoning of Allsun Juices.  A trustee was not justified when the sole purpose was to have trustee formulate a plan of reorganization and investigate intercompany transfers.  Id.  In the case at hand, the creditors seek assistance in getting the debtor reorganized, investigation of questionable transfers, and in a reconciliation of the books surrounding the asset acquisition.  But more importantly, the creditors seek additional operational management, and the debtor agrees, as does Reeder, that operations strength is essential.  While the debtor points to the contract with the Belet Group, this is a short term "quick fix" measure that leaves the debtor with an uncertain future.

The debtor, relying on Dalkon Shield Claimants v. A.H. Robins Co., Inc., 828 F.2d 239 (4th Cir.1987), and General Oil Distributors, 42 B.R. at 402, urges the court to weigh the costs of appointing a trustee with the possible benefits to be derived.  This is certainly proper, especially under section 1104(a)(2).

11 U.S.C. § 1104(a)(2) provides a flexible standard for the appointment of a trustee. In re Sharon Steel Corp., 86 B.R. 455 (Bankr.W.D.Pa.1988);  In re Deena Packaging Industries, Inc., 29 B.R. 705 (Bankr. S.D.N.Y.1983).  Section 1104(a)(2) allows the court to engage in a cost-benefit analysis in order to determine whether the appointment of a trustee would be in the best interest of creditors, equity security holders, and other interests of the estate.  In re Sharon Steel Corp., 86 B.R. at 455. Essentially, the court must ascertain if the cost of appointing a trustee is outweighed by the benefits derived by the appointment. In re Clinton Centrifuge, 85 B.R. at 980.

The appointment of a trustee is an extraordinary remedy.  The mere fact that a petition is filed in bankruptcy does not demonstrate that managers are incapable or unsuited to effectuate the reorganization.  Slight evidence of mismanagement in the form of imprudent, or poor business decisions, or the poor use of resources are to be expected, and will not alone overcome

---

**19.**  Pearson was subsequently removed as chief financial officer.

the presumption of a DIP. *In re La Sherene, Inc.*, 3 B.R. at 174.

■ The court should balance the harm and benefit of removing or retaining current management. *Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 241 (4th Cir.1984), See, also *General Oil Distributors, Inc.*, 42 B.R. 402 (Bankr.E.D. N.Y.1984). A court must find something beyond simple mismanagement in order to appoint a trustee for cause. *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644–45 (Bankr.E.D.N.Y.1980). In fact, gross mismanagement must be found. *Id.*

The factors used to determine gross mismanagement vary depending on the facts of the case, but often include elements that hint at fraud, in addition to negligence. *In re La Sherene*, 3 B.R. at 175.

## CONCLUSION

■ Based on the foregoing, the court makes no finding as to "cause" under section 1104(a)(1), but determines under section 1104(a)(2) that it is in the best interest of the creditors, the estate, and other parties in interest that a trustee be appointed. This is based in part on the considerable and continuing erosion of confidence in the debtor and its board of directors to operate the company.

The acknowledgement by the debtor of the need for outside operational management is an important factor in this proceeding. While the debtor argues that it has shored up its operations by employing a management group, corrective measures that are too few and too late, cannot defeat a change in management. *In re Sharon Steel Corp.*, 871 F.2d 1217 (3rd Cir.1989). Further, the management group may be removed by the debtor at any time.

The court is asked to weigh the cost of appointment of a trustee versus the benefit of leaving the debtor in possession. Presently the debtor is paying seven thousand five hundred dollars ($7,500.00) per week for outside management. Therefore, there is already an additional financial burden on the estate. Because of the erosion of confidence in the debtor, there is likely to be increased litigation which will result in escalating legal costs to the estate. Finally, because the debtor is not in a strong posture to pursue possible claims that may have resulted from conflicts of interest and fraudulent transfers, a trustee would likely be able to investigate claims that could result in additional sums of money coming into the estate. The court in *In re Sharon Steel*, 871 F.2d at 1228, *citing In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr.N.D.W. Va.1980) where the judge held:

"that although no clear proof of fraud, dishonesty, or gross mismanagement had been presented, intercompany transactions exceeding $1 Million Dollars justified appointment of a trustee under section 1104(a)(2) because the size and number of transactions places current ... management ... in a position of having grave conflict of interest, and the presumption arises that the current management ... will be unable to make the important investigation and decisions demanded."

Further, the court must concern itself with the question of current management's fitness to see the debtor through a successful reorganization.

The failure of the debtor to investigate potential avoidable or preferential transfers weigh heavily in favor of appointing a trustee. Further, the failure of the debtor to attempt to collect substantial dormant receivables on the debtor's books from the parent company militates in favor of the appointment of a trustee. The protection and potential recovery of vast sums for the estate, should a trustee be appointed, far outweigh the costs of services to be rendered. The potential amount to be recovered from Holding's receivables alone could exceed $1.4 million dollars.

For the foregoing reasons and based on the case record as a whole, the court finds that it is in the best interest of creditors, the estate, and other parties in interest to appoint a trustee. Therefore, the motion of the unsecured creditors' committee and Litton Industries requesting the appointment of a trustee is granted. Accordingly and by virtue of 11 U.S.C. § 1104(c), the

 

United States Trustee, after consultation with parties in interest shall select and appoint, subject to the court's approval, one disinterested person to serve as trustee in this case.

IT IS SO ORDERED.