### In re U.S. COMMUNICATIONS OF WESTCHESTER, INC., Debtor.

**Bankruptcy No. 91 B 20043.**

United States Bankruptcy Court, S.D. New York.

Feb. 1, 1991.

---

Coudert Brothers (Michael J. Calvey and Thomas J. Weber, of counsel), New York City, for The ABL Corp.

Ellen G. Zindler, New York City, for U.S. Communications of Westchester, Inc.

Norma Ortiz, Asst. U.S. Trustee, New York City.

Haynes and Boone (Robin E. Phelan, of counsel), Dallas, Tex., for Intellicall, Inc.

### DECISION ON ORDER TO SHOW CAUSE FOR APPOINTMENT OF TRUSTEE

HOWARD SCHWARTZBERG, Bankruptcy Judge.

ABL Corp. ("ABL"), the above-captioned debtor's largest creditor, with claims in ex- cess of $27 million, has moved pursuant to 11 U.S.C. § 1104(a) for an order directing the appointment of a Chapter 11 trustee. ABL charges that the management of the Chapter 11 debtor, U.S. Communications of Westchester, Inc., have been and are in- competent and irresponsible and have en- gaged in an ongoing pattern of fraud in obtaining funding from ABL for hundreds of telephones through submission of dupli- cate or false requests for funding, and other fraudulent conduct. ABL also alleg- es that the debtor consciously failed to maintain adequate or up-to-date books and records or controls with respect to its ac- counts, including the elimination of the means for such control.

The debtor, U.S. Communications of Westchester, Inc., is in the business of owning and operating pay telephones re- ferred to as Customer–Owned–Coin–Oper- ated Telephones ("COCOTS"). The COCOTS are owned by the debtor, which leases space to place the COCOTS in loca- tions in areas generally where local tele- phone companies do not desire to install their own telephone booths or telephone equipment, usually low income areas and fast food locations. The debtor resists ABL's motion for a trustee and argues that ABL was thoroughly involved in the debt- or's business and has full knowledge of the debtor's management and operations.

The hearing with respect to ABL's mo- tion concluded yesterday evening, January 31, 1991, at which time the court reserved decision. Based on the testimony and the exhibits admitted in evidence, the court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. On January 11, 1991, U.S. Communi- cations of Westchester, Inc. filed with this court a petition for reorganizational relief under Chapter 11 of the Bankruptcy Code and thereafter continued to operate its business and manage its properties as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2. The debtor is a New York corporation located in Yonkers, New York, with branch offices in the states of Florida, Nevada, Pennsylvania, Virginia and North Carolina. It owns and operates Customer–Owned–Coin–Operated Telephones or "COCOTS". Those are public pay telephones which are connected to a phone line, called a "public access line," provided by local exchange carriers—New York Telephone in New York City. COCOTS are now found in hospital waiting rooms, pizza parlors, auto dealerships, bodegas, college campuses and many other public facilities. The owners of the facilities buy and install a COCOT on their premises or, more frequently, lease the space to the provider company, which owns, installs, operates and maintains the COCOT in the same fashion as a vending machine business. In exchange, the owner of the space receives a percentage of the gross revenue from the telephone.

3. The debtor owns and operates COCOT routes in either 28 or 16 states, depending upon whose testimony is accepted. It derives its revenue from coins deposited into the telephones, coinless telephone calls placed by means of operator assisted credit cards and collect calls, and coinless telephone calls placed through a telephone system which employs integrated circuit boards as substitutes for live operators. A major share of the debtor's revenue is derived from monthly receipts from Intellicall, Inc. of Dallas, Texas, which owns and operates technology that provides computer generated services as a substitute for live operator services.

4. The debtor is not a publicly-owned corporation. It has two classes of stock, Class A voting, non-profit participating stock and Class B non-voting, profit participating stock. The majority of the Class A voting stock (51%) is owned beneficially by George Coloney ("Coloney"), the Chief Executive Officer and Chairman of the debtor's Board of Directors. Coloney is also under a consulting contract with the debtor, for which he is paid a salary of $260,-000.00 per year. The remaining Class A stock is owned by Andrea Garson, the wife of Isaac Garson, who is a director and employee of the debtor.

5. ABL is a corporation engaged in the business of financing COCOT providers. ABL has a security interest in all of the debtor's assets as collateral for advances which it made to finance the debtor's operations. ABL's president is Joseph Blau ("Blau"), whose relationship with the debtor commenced in 1987, when the debtor owned approximately 100 telephone locations. With Blau acting for ABL and Coloney acting for the debtor, a Loan and Security Agreement, dated December 11, 1987, was executed by the parties whereby ABL granted the debtor a $3 million line of credit and advanced funds for the installation of telephones by the debtor.

6. Coloney testified that Blau suggested that the debtor employ someone to handle the debtor's financial operations. As a result, Terry Ballard ("Ballard") was hired by the debtor as its president. Additionally, an affiliated marketing company was formed to obtain site locations for the debtor. This affiliated company was called National Telecommunications, Inc. ("NTC"). Later Ballard left the debtor to become president of NTC.

7. On October 1, 1989, with ABL's assistance, the debtor entered into an agreement to purchase Century Systems, Inc., a telephone company owned by ABL. This agreement provided that ABL would provide funding for an additional 10,000 telephones annually. Additionally, Blau assisted the debtor in negotiating for the purchase of two new telephone companies, one in Chicago and one on the east coast. However, ABL backed off from funding the purchase of the two additional companies. The two new companies were acquired, instead, by NTC and not by the debtor.

8. Coloney testified that Century Systems, Inc. did not have as many telephones as he originally expected and that the debtor's revenues dropped. Thereafter, Blau and ABL curtailed their credit advance to the debtor, with the result that in July of 1990, approximately one-half of the debtor's employees were let go. Accordingly,

the debtor was understaffed and pressured by creditors, so that the debtor could not find time or qualified personnel to keep the debtor's financial books and records up to date.

9. John P. Calcutt, a senior manager for the accounting firm of Ernst and Young, testified that his firm was engaged by ABL to audit the debtor's books and records in November of 1990. Ernst and Young was unable to express any opinion as to the debtor's balance sheet because the debtor's books and records were in a state of disarray. He found few internal controls in place; the May, 1990 trial balance was out of balance by $12 million; the general ledger had not been posted for five months; the debits did not equal the credits (which is a real red flag in any business); the receivables were off by $1.5 million; the fixed asset account, which was the debtor's largest account, contained assumed figures; the debtor's controller, Thomas Bookless, did not know what a $350,000.00 capital lease item represented, as reflected on the debtor's books; the debtor's financial personnel had no idea which entities owned a $600,000.00 deposit held by Intellicall, Inc.; checks were signed by Thomas Ballard, the debtor's former president who is now employed by the debtor's affiliated company, NTC. Additionally, Calcutt discovered numerous bounced checks because of payments made in anticipation of funds that were expected to be deposited in the debtor's accounts.

10. Significantly, the debtor made coin collections from its own accounts and from those of its affiliated company, NTC and completely commingled the funds. There were no controls as to how the allocation of funds were made, nor were there any reconciliations to correct improper allocations. No controls were in place as to these collections.

11. John Cocola, the general counsel of ABL testified that the debtor's affiliate NTC, which was originally formed to provide marketing and contracting operations for the debtor, became a competitor of the debtor in April of 1990 when it acquired telephone operations in New York and Chicago. Nonetheless, NTC had use of the debtor's computers, employees, management and facilities, all of which were paid for by the debtor.

12. Payment summaries reflecting telephone operations maintained by the debtor's affiliate, NTC, reveal a gross revenue in 1990 of $193,161.86 from the computer generated services of Intellicall, Inc., whereas the summaries reflect that NTC paid no license fees to Intellicall, Inc. because these fees were paid by the debtor. Similarly, NTC's subsidiary, U.S. Communications of Illinois grossed $464,259.67 for the same period and paid license fees for only 613 computerized board locations, whereas the balance of the license fees to generate the gross income were paid for by the debtor. ABL established that during the period in question, the debtor's affiliate, NTC, and its subsidiary owned approximately 4,000 telephone locations.

13. When the debtor's affiliate, NTC, acquired the two small companies, the debtor issued a $1 million guarantee on behalf of NTC, although the debtor informed ABL that no guarantees were given.

14. In furtherance of the security agreement which the debtor entered into with ABL, the debtor was required to establish and maintain custody accounts for coins collected from the telephone operations to collateralize ABL's secured advances. However, the debtor never opened custody accounts; it applied the coins towards the debtor's general operations; and did not keep accurate records or provide correct information with respect to the coins collected from the telephone operations.

15. The debtor has not properly accounted to ABL for the number of telephones in operation. ABL concludes that it financed 8,700 telephone locations; Ernst and Young could only identify 7,600 telephone locations, whereas the debtor identified 12,622 telephone locations in a report to the New York Telephone Company.

16. John Cocola further testified that the debtor at times submitted reports containing approximately 1000 duplicate telephone locations and billings, for a distorted

figure of approximately $1.3 million based on duplicate submissions from the debtor.

17. The debtor received substantial adverse publicity when the New York City Department of Consumer Affairs charged the debtor with deceptive practices and consumer violations, including overcharging customers, increasing the rates even after the calls had already been made (known as "rerating") and failing to comply with administrative regulations. The debtor was also the subject of a "Shame–on–You" program on a local television news channel.

18. Barry Katz, a certified public accountant, called to testify for the debtor, said that he had been contacted by the debtor's former president, Ballard, to help clear up some of the accounting problems. His firm's services were paid for by ABL. In 1988, when Katz first visited the debtor's premises, they only had one person doing bookkeeping work. In the Spring of 1990, Katz suggested some controls and procedures to put the debtor's books in shape. However, by November and December of 1990, Katz observed that most of the debtor's accounting personnel had been dismissed. Some of the controls that he had previously recommended were not put in place, whereas, other procedures were no longer being followed. For example, Katz recommended that paid invoices be stamped with the date of payment so as to identify which invoices remained to be paid. However, the debtor never adopted this procedure. Katz was advised that the debtor's remaining financial employees were too busy making deposits and paying bills and just did not have the time to stamp paid invoices.

19. The Ernst and Young representative concluded that the debtor's management does not have the capability to manage a company of its size nor does management appreciate the need for controls over cash, fixed inventory or the need for orderly books and records. The concept of adequate controls works not only for the debtor, but also for the benefit of parties relying on the financial information.

## DISCUSSION

Pursuant to 11 U.S.C. § 1104(a)(1), a party in interest may request the appointment of a trustee for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the Chapter 11 case. However, the appointment of a Chapter 11 trustee is the exception rather than the rule because it is an extraordinary remedy, inasmuch as the Bankruptcy Code favors allowing a debtor to remain in possession and operate its business. *In re Microwave Products of America, Inc.,* 102 B.R. 666, 670 (Bankr.W. D.Tenn.1989); *In re McCorhill Publishing, Inc.,* 73 B.R. 1013, 1017 (Bankr.S.D.N.Y. 1987).

In the instant case, the debtor has engaged in certain conduct which reveals a lack of competence to conduct a business operation in furtherance of its fiduciary duty to its creditors. The debtor's failure to maintain a current general ledger and its failure to maintain its financial books and records to the extent that the accounting firm of Ernst and Young concluded that the debtor's financial records were unauditable, are cogent examples of business incompetence. Such conduct results in a complete erosion of trust and confidence by creditors. A court's willingness to allow a debtor's management to remain in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Fixtures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985) quoting *Waff v. Weinstein,* 372 U.S. 633, 651, 83 S.Ct. 969, 980, 10 L.Ed.2d 33 (1963).

In a somewhat similar situation in another case, *In re McCorhill Publishing, Inc.,* this court said:

> However, when a debtor fails to maintain complete and accurate financial records, or fails to substantiate undocumented transactions, so that there appears to be a confusion in the debtor's accounting system, the courts have

viewed these facts as gross mismanagement and have directed the appointment of a Chapter 11 trustee. *In re Main Line Motors, Inc.,* 9 B.R. [782] at 784, [ (Bkrtcy.E.D.Pa.1981) ]; *Midlantic National Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.),* 4 B.R. [635] at 645 [ (Bkrtcy.E.D.N.Y.1980) ]; *Hotel Associates v. Trustee of Central States SE and SW Areas Pension Fund (In re Hotel Associates, Inc.),* 3 B.R. [343] at 345 [ (Bkrtcy.E.D.Pa.1980) ]. Similarly, where there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, a trustee should be appointed in the best interests of creditors and all parties in interest in order to investigate the financial affairs of the debtor. *In re Philadelphia Athletic Club, Inc.,* 15 B.R. 60 (Bankr.E.D.Pa.1981); *In re L.S. Good & Co.,* 8 B.R. [315] at 315 [ (Bkrtcy.N.D.W.Va.1980) ].

*In re McCorhill Publishing, Inc.,* 73 B.R. at 1017.

A trustee is required in this case in order to rectify the financial irresponsibility which continues to plague the debtor's operations. The debtor has been too harassed by problems with its creditors and its poor cash position to take time to put its books in order or to implement a financial system which it has acquired, but has not yet tested. The debtor's condition reflects more aptly a total lack of financial management, rather than gross mismanagement. There was no mismanagement because there was no management. This state of affairs for a company this size can only be regarded as reflecting sheer financial incompetence on the part of its current management.

■ The parties in interest are attempting to negotiate as to the selection of an independent financial manager acceptable to all the parties who would take over the financial controls of the debtor pursuant to the terms of an agreement that the parties would formulate. In the event that the parties are unable to arrive at this agreement within three days from the date of the order entered by this court, or in the event that the independent financial manager assumes responsibilities and thereafter does not receive the unanimous consent of all the parties to continue in the agreed capacity, a Chapter 11 trustee shall be appointed immediately thereafter by the United States trustee for cause pursuant to 11 U.S.C. § 1104(a)(1).

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

2. ABL has sustained its burden of establishing that a Chapter 11 trustee should be appointed for cause pursuant to 11 U.S.C. § 1104(a)(1) for the debtor's incompetence in the handling of its financial affairs.

3. ABL has sustained its burden of establishing that a Chapter 11 trustee should be appointed in the best interests of creditors in accordance with 11 U.S.C. § 1104(a)(2).

4. In the event that the parties are unable to agree unanimously for the appointment of an independent financial manager within three days from the date of the order entered by this court, or in the event that the independent financial manager assumes responsibilities and thereafter does not receive the unanimous consent of all the parties to continue in the agreed capacity, a Chapter 11 trustee shall be appointed immediately thereafter by the United States trustee for cause pursuant to 11 U.S.C. § 1104(a)(1).

IT IS SO ORDERED.